UNITED STATES of America, Plaintiff,

v.

Alejandro Garcia IBARRA, Defendant.

No. CR89–0025J.

United States District Court, D. Wyoming.

Nov. 15, 1989.

Lesa Leschuck, Asst. U.S. Atty., Cheyenne, Wyo., for plaintiff.

Steven Kissinger, Cheyenne, Wyo., for defendant.

## MEMORANDUM OPINION AND ORDER RULING ON MOTION TO SUPPRESS EVIDENCE

ALAN B. JOHNSON, District Judge.

On March 24, 1989, Alejandro Garcia Ibarra and his friend, Maria Linares, were traveling at a lawful rate of speed in a white 1981 Oldsmobile Cutlass with California tags east through Wyoming on Interstate 80. At that time, Wyoming Highway Patrolman Scott Mahaffey noticed the car because its driver, Ibarra, appeared to be driving at a rate of speed slightly slower than other traffic. He also observed that the car appeared to "weave" within its marked lane of traffic. Thinking that the driver of the car was intoxicated, Mahaffey followed the vehicle for approximately five miles during which he saw the vehicle pass two other vehicles by making what he characterized as "abrupt lane changes without the use of turn signals." At the time that the vehicle made one of the passes, Mahaffey noticed that the vehicle almost cut off a pickup truck. After observing intermittent weaving, Mahaffey stopped the vehicle to determine whether the driver was intoxicated.

Before getting out of his patrol car, Mahaffey noticed there were two persons in the Oldsmobile. He stepped out of his patrol car and approached the driver's side of Ibarra's vehicle and asked him for his driver's license, which Ibarra promptly produced. When Mahaffey informed Ibarra that he stopped him for failing to signal before passing and for weaving, Ibarra responded that he thought he had signaled, but perhaps he had not. Mahaffey returned to his patrol car where he issued a warning ticket to Ibarra for failing to signal when passing. Although Mahaffey stopped Ibarra on suspicion of drunk driving, he failed to pursue an investigation of this possible offense other than by conducting a cursory observation of Ibarra's appearance and behavior.

While in his patrol car, Mahaffey requested that his dispatcher check Ibarra's driver's license. The dispatcher indicated that Ibarra's license had been suspended for failure to pay reissue fees. Using his loud speaker, Mahaffey requested that Ibarra bring the vehicle registration to him. He told Ibarra about his suspended driver's license and that he would issue a citation to him for operating a motor vehicle with a suspended license, which re-

quired that Ibarra post a $220 appearance bond. Ibarra returned to his vehicle where he obtained the money for the bond, which he then gave to Mahaffey. Mahaffey, however, found a potential problem with the vehicle's registration, which showed that the vehicle belonged to Charles J. Petrocchi. Ibarra explained that he recently purchased the vehicle from Mr. Petrocchi. Because the ownership certificate and the registration did not indicate a transfer of ownership to Ibarra, Mahaffey requested that the dispatcher contact Petrocchi to determine the vehicle's ownership status. Meanwhile, a second Wyoming highway patrolman, Gregory Leazenby, arrived at the scene and sat in the back of Mahaffey's patrol car.

After paying the bond, Ibarra stated he had only about $40 left with which to travel to Chicago. Mahaffey proceeded to question Ibarra about his itinerary to which Ibarra reportedly gave conflicting answers. Ibarra first stated he was traveling to Chicago to visit friends. Mahaffey inquired whether Ibarra's friends in Chicago could send money to him to which Ibarra answered that he would need to call them and ask. Mahaffey continued his questioning and asked whether Ibarra's friends in Chicago were "friends" or "relatives." Ibarra replied "cousins." Upon further inquiry by Mahaffey, Ibarra stated he was moving to Chicago. Observing that Ibarra was traveling "light," Mahaffey became suspicious and asked Ibarra if the vehicle contained any "weapons, large amounts of money, or controlled substances" to which Ibarra answered, "No." Mahaffey then asked if he "could look at the contents" of Ibarra's car. Ibarra agreed. When the officers and Ibarra departed from the patrol car, Mahaffey asked Ibarra if he could look in the trunk. Without responding, Ibarra opened the trunk, which revealed several nylon bags. Without asking whether he could search these bags, Mahaffey opened them but discovered nothing unusual. Mahaffey then began to search the passenger compartment, while Leazenby continued searching the trunk.

After completing the search of Ibarra's vehicle, which revealed nothing illegal, Mahaffey informed Linares that Ibarra could not drive the car and that she would need to drive it provided she had a valid driver's license. Linares's driver's license, however, turned out to be expired. At this point, Mahaffey, without consulting with Ibarra, called for a private wrecker to tow Ibarra's vehicle into Laramie, which was a short distance away. He informed Ibarra that he needed to find a licensed driver before the car would be released.

Before the wrecker arrived, the officers separated Ibarra and Linares, and transported them in separate patrol cars to the Western Union station in Laramie. The officers took them there so that they could wire for extra money and find a licensed driver. During the trip to town, Mahaffey used his radio to speak to Charles Petrocchi's wife, who was then in telephonic contact with Mahaffey's dispatcher. Mrs. Petrocchi confirmed that her husband had in fact sold the vehicle to Ibarra. Mahaffey also discovered at this time that Ibarra had no liability insurance for the vehicle, which is mandatory in Wyoming.

After dropping off Ibarra and Linares at the Western Union station, the officers went to Warren's towing, the place where Ibarra's vehicle had been towed. Thinking they still had Ibarra's consent to search, they renewed their search of Ibarra's vehicle. While searching the trunk, Mahaffey noticed a plastic bag behind the spare tire and, after removing it, he found several clear plastic gloves and a large package wrapped with duct tape. Through a cut in the tape he saw a white powdery substance that turned out to be cocaine. Leazenby returned to the Western Union station to arrest Ibarra and Linares. Ibarra was later indicted by a federal grand jury for possession of cocaine with intent to distribute it in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(ii). On May 10, 1989, Ibarra filed a motion to suppress all evidence seized during the search and all evidence obtained therefrom, on the ground that the search violated the Fourth Amendment to the United States Constitution for four reasons: (1) the initial stop was unconstitutionally pretextual; (2) he revoked his con-

sent before the second search occurred; (3) the seizure of his vehicle—i.e. impoundment—was unlawful; and (4) his initial consent to search was not freely and voluntarily given. The case came before the court for an evidentiary hearing held on September 12, 1989.

With few exceptions, the fourth amendment protects our right to privacy by prohibiting police from conducting searches without a warrant issued by a detached and neutral magistrate or court upon probable cause. "The security of one's privacy against arbitrary intrusion by the police—which is at the core of the fourth amendment—is basic to a free society." *Wolf v. Colorado,* 338 U.S. 25, 27, 69 S.Ct. 1359, 1361, 93 L.Ed. 1782 (1949). To give effect to the fourth amendment's guarantee against unreasonable searches and seizures, and to deter illegal police conduct, the court must apply the exclusionary rule and suppress any evidence unconstitutionally obtained. *Nix v. Williams,* 467 U.S. 431, 442–43, 104 S.Ct. 2501, 2508–09, 81 L.Ed.2d 377 (1984); *Wong Sun v. United States,* 371 U.S. 471, 484, 83 S.Ct. 407, 415, 9 L.Ed.2d 441 (1963); *Weeks v. United States,* 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914).

Some of the exceptions to the fourth amendments warrant requirement include the following: (1) a limited warrantless search following an arrest, *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969); (2) A warrantless search of a vehicle as well as a warrantless search of all containers found therein where probable cause exists to believe the vehicle contains contraband, *United States v. Ross,* 456 U.S. 798, 825, 102 S.Ct. 2157, 2173, 72 L.Ed.2d 572 (1982); (3) a warrantless search done pursuant to consent, *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 2043–44, 36 L.Ed.2d 854 (1973); (4) a warrantless inventory search of a vehicle conducted after the vehicle has been lawfully impounded by police, *South Dakota v. Opperman,* 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976) (plurality opinion). The government, of course, has the burden of showing by a preponderance of the evidence that a warrantless search

comes within one of the exceptions to the fourth amendment's warrant requirement. *Coolidge v. New Hampshire,* 403 U.S. 443, 455, 91 S.Ct. 2022, 2032, 29 L.Ed.2d 564 (1971).

The court examines first Ibarra's argument that the evidence should be suppressed because the traffic stop was a pretext for Mahaffey to investigate more serious and unrelated criminal conduct for which he did not have reasonable suspicion needed to justify a detention. It is well established that a stop by police of a vehicle to detain its occupants, no matter how brief and limited its purpose, is a seizure within the meaning of the fourth amendment. *Delaware v. Prouse,* 440 U.S. 648, 653, 99 S.Ct. 1391, 1395, 59 L.Ed.2d 660 (1979). Police may stop a vehicle traveling on a public highway whenever they have probable cause to believe or reasonable suspicion that the vehicle is being driven in violation of the state's motor vehicle laws. *Id.* 440 U.S. at 663, 99 S.Ct. at 1401; *see also United States v. Neu,* 879 F.2d 805 (10th Cir.1989). The scope of a police officer's actions during a traffic stop is limited generally to asking the driver for his license and vehicle registration, running an NCIC check, and issuing a warning or citation. *United States v. Guzman,* 864 F.2d 1512, 1519 (10th Cir.1988). In a traffic stop, the officer must allow the driver of the vehicle to proceed on his way, without further delay by additional questioning, once "the driver has produced a valid license and proof that he is entitled to operate the car" unless the officer has a reasonable suspicion that another serious crime is transpiring. *Id.* at 1519.

A routine traffic stop for a minor traffic infraction may be unconstitutional, however, where the stop is a pretext for investigating more serious criminal conduct for which the officer has neither reasonable suspicion nor probable cause to justify a detention. *Guzman,* 864 F.2d at 1515. The court, therefore, must apply the exclusionary rule and suppress any evidence seized during a stop that it finds unconstitutionally pretextual. *Id.* at 1518. In *Guzman,* the Tenth Circuit adopted the follow-

ing test developed by the Eleventh Circuit for determining whether a traffic stop is unconstitutionally pretextual: " 'A court should ask—not whether the officer *could* validly have made the stop, but whether under the same circumstances a reasonable officer would have made the stop in the absence of the invalid purpose.' " *Guzman*, 864 F.2d at 1517 (quoting *United States v. Smith*, 799 F.2d 704, 709 (11th Cir.1986)). (Emphasis supplied by the court in *Smith*.) In *Smith*,[1] the court explained:

> That an officer theoretically *could* validly have stopped the car for a possible traffic infraction [i]s not determinative. Similarly immaterial [i]s the actual subjective intent of the deputy. [A] stop [i]s unreasonable not because the officer secretly hope[s] to find evidence of a greater offense, but because it [i]s clear that an officer would have been uninterested in pursuing a lesser offense absent that hope.

799 F.2d at 710 (emphasis in original). Thus, the resolution of this issue depends on whether Mahaffey's stop of Ibarra was objectively reasonable.

Under the traffic laws of Wyoming, "[a] vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from the lane until the driver has first ascertained that the movement can be made with safety." Wyo.Stat. § 31–5–209(a)(i) (Jun.1989). This law specifically applies to any road "divided into two or more clearly marked lanes," and therefore includes an interstate. Notably absent from the statute is the requirement that a driver signal before changing lanes. Although this statute does not require that a signal be used prior to a lane change, the requirement of a signal appears to be imposed by a different statute, which provides "no person shall turn a vehicle or move right or left upon a roadway unless and until the movement can be made with reasonable safety nor without an appropriate signal in the manner provided by this section." Wyo.Stat. § 31–5–217(a) (Jun. 1989). The manner of the signal appears to be provided in subsection (b), which states that "a signal of intention to turn right or left when required shall be given continuously during not less than the last 100 feet traveled by the vehicle before turning."

Ibarra argues that this statute does not require that a motorist signal before passing. It is beyond dispute, however, that the statute does require that a motorist pass only after he can do so with reasonable safety. At the hearing in this matter, the officer testified that he observed Ibarra cut off a second vehicle while passing, which would indicate a possible violation of Wyo.Stat. § 31–5–209(a)(i). Additionally, Mahaffey testified that Ibarra made both passes abruptly and that he weaved intermittently. It would therefore appear that Mahaffey had both probable cause as well as a reasonable suspicion to stop and detain Ibarra. *See, e.g., Norman v. State*, 747 P.2d 520, 521–22 (Wyo.1987) (erratic driving probable cause to stop). Although this is a close case on the pretext issue and is similar to *Smith*, the court finds under the circumstances that a reasonable officer would have been interested in stopping Ibarra independent of any hope that he was engaged in more serious criminal conduct.

■ Ibarra next argues that even assuming the first search was constitutional, the second was not because Ibarra had affirmatively revoked his consent to search when he closed and locked the trunk. Initially the Government argued that the second search was conducted pursuant to Ibarra's "continuing consent." Prior to the suppression hearing in this matter, however, the Government abandoned this position and argued instead that although the

---

1. *Smith* is factually similar to this case. There, the officer stopped a vehicle because it met the criteria of a drug courier profile. The officer stated, however, he had both probable cause or reasonable suspicion for the stop because the car was traveling slightly below the speed limit and it occasionally weaved within its lane of traffic. The court "conclude[d] that a reasonable officer would not have stopped the car absent an additional, invalid purpose." 799 F.2d at 711. Unlike here, however, the officer admitted he stopped the car based on a drug courier profile.

second search was illegal, *see, generally United States v. Recalde*, 761 F.2d 1448 (10th Cir.1985) (second search after the vehicle has been seized requires a second consent), it nevertheless should be upheld under the "inevitable discovery doctrine," in that the cocaine would have been discovered eventually when the officers conducted an inventory search of the vehicle. The Government's argument, of course, assumes that the officers could have conducted such a search.

An inventory search will be upheld only if it is reasonable under the fourth amendment in light of the facts and circumstances of the particular case. *Opperman*, 428 U.S. at 375, 96 S.Ct. at 3100. The purposes for an inventory search are to protect the owner's property while in police custody; to protect the police against claims of lost or stolen property; and to protect the police from potential danger. *Id.* at 369, 96 S.Ct. at 3097. In *Opperman*, the defendant's vehicle had been seized by police and impounded for numerous parking violations. After impounding the vehicle, the police conducted an inventory search and discovered contraband, which the defendant sought to have suppressed on fourth amendment grounds. In a plurality opinion, the Supreme Court upheld the search, finding that the "police were indisputably engaged in a caretaking search of a *lawfully* impounded vehicle," and that "[t]he owner, having left his car illegally parked for an extended period, and thus subject to impoundment, was not present to make other arrangements for the safekeeping of his belongings." *Id.* at 375, 96 S.Ct. at 3100 (emphasis added).

Under *Opperman* an inventory search is reasonable when, at a minimum, it is incident to a lawful impoundment and not conducted as "a pretext concealing an investigatory police motive." *Id. See also United States v. Hellman*, 556 F.2d 442, 444 (9th Cir.1977) (inventory search unlawful when motivated by investigatory purposes); *Benavides v. State*, 600 S.W.2d 809, 810 (Tex.Cr.App.1980) (inventory search reasonable where impoundment is lawful). *Opperman* therefore establishes the unremarkable proposition that police may impound a vehicle where it

impedes traffic or threatens public safety due to its immobilization or violation of a parking ordinance. 428 U.S. at 368, 96 S.Ct. at 3096. In *Benavides*, however, the court listed six additional categories under which the police may lawfully impound a vehicle:

> These included impoundment where the owner or operator requested or consents to it; where the vehicle is stolen or the police reasonably believe it to be stolen; if the vehicle is abandoned, a hazard or so mechanically defective that it creates a hazard; if the driver is arrested for being intoxicated and there is no other person to drive or safeguard the vehicle; when the police are authorized by statute to impound the vehicle; and where the driver is placed under custodial arrest and no other alternatives are available to ensure the protection of the vehicle.

*Reamey, Reevaluating the Vehicle Inventory*, 19 Crim.L.Bul. 325, 328 (1983) (citing *Benavides*, 600 S.W.2d at 811). Absent these factors, taking custody of a vehicle would be an unlawful seizure. These, however, are only rough categories so that in evaluating whether an inventory search is lawful the court must find that the impoundment was prompted by "some reasonable necessity." *State v. McDaniel*, 156 N.J.Super. 347, 383 A.2d 1174, 1179 (1978). In *McDaniel* the court emphasized a showing of reasonable necessity as follows:

> The common theme underlying these cases and others is that something more must be shown to justify impoundment of a car *than that it would otherwise be left unattended.* There must be a showing that some reasonable necessity prompted the impoundment. This is a salutary rule, for otherwise police would be authorized to freely stop a car for a minor traffic infraction, impound it and search it with impunity. Surely such a circumstance is not consonant with the fourth amendment.

*Id.* (emphasis added). The court adopts this reasoning, which appears consistent with that of the Tenth Circuit, requiring the government to show that "reasonable necessity prompted the impoundment."

*See, e.g., United States v. Pappas,* 735 F.2d 1232, 1234 (10th Cir.1984) (inventory search of a vehicle unlawful where the police had no reasonable need to impound the vehicle).

The government argues that impoundment was statutorily authorized for three reasons: (1) a licensed driver was unavailable to drive Ibarra's vehicle; (2) Ibarra did not have liability insurance; (3) the car was threatening public safety because it was parked along the interstate on a curve. As previously noted, an inventory search is reasonable only where the initial taking of custody of the vehicle has been considered lawful, such as where it is authorized by statute. At the hearing in this matter, Officer Mahaffey testified that he had authority to take custody of Ibarra's vehicle pursuant to the "Wyoming Legislature." Examining the relevant Wyoming statutes, cited to the court by the defendant, the court finds that a police officer may take custody of a vehicle under limited circumstances. The law in effect at the time of this incident provided in relevant part as follows:

Any police officer may remove or cause to be removed to the nearest garage or other place of safety any vehicle found upon a highway when:

(i) Report has been made that the vehicle has been stolen or taken without consent of its owner;

(ii) The person in charge of the vehicle is unable to provide for its custody or removal; or

(iii) When the person driving or in control of the vehicle is arrested for an alleged offense for which the officer is charged by law to take the person arrested before a proper judge without unnecessary delay.

Wyo.Stat. § 31–5–508(c) (1984). Under the facts of this case, Mahaffey was authorized under Wyoming law to take lawful custody of the vehicle at issue under four circumstances: (1) where a report had been received by him that the vehicle was stolen or (2) being operated without the owner's permission; (3) Ibarra had been arrested for a serious offense; or (4) Ibarra was unable to provide for the car's custody or removal, which of course requires that there be a need for a lawful custody or lawful removal.

At the hearing, Mahaffey's testimony indicated that he had no report that the 1981 Oldsmobile driven by Ibarra was stolen or being operated without the owner's consent. Instead, the evidence was to the contrary. There was no evidence that Ibarra could have been or was arrested for a serious offense. Although Ibarra could have been arrested for the minor offense of operating a motor vehicle without a license, the evidence showed that he was in fact not arrested. Ibarra was instead allowed by law to post a bond securing his court appearance at a later date. Even assuming he was unable to post a bond, it is doubtful Mahaffey could have seized and impounded his vehicle for this offense. *See Dyke v. Taylor Implement Manufacturing Co.,* 391 U.S. 216, 88 S.Ct. 1472, 20 L.Ed.2d 538 (1968).

The government argues that the vehicle, by being parked along the interstate, was threatening public safety, requiring that the officers remove the vehicle because Ibarra apparently was unable to do so. Aside from the fact Mahaffey never gave Ibarra an opportunity to arrange for the removal of his vehicle, the court finds the argument unsupported by the facts in the record. Although Mahaffey testified at the hearing that the vehicle was parked along the interstate on a curve, where it purportedly could have caused an accident, the court finds this testimony undercut by the fact Mahaffey detained Ibarra at the same location while he performed a routine traffic check and later a search of Ibarra's vehicle. Ibarra was stopped at approximately 3:00 p.m. and the wrecker arrived approximately 45 minutes later. Evidently the vehicle was parked approximately two and one-half feet off the side of the road. Notwithstanding Mahaffey's concern that the vehicle might cause an accident, no evidence was offered that Mahaffey made an attempt to move the vehicle from the shoulder of the highway. No evidence was offered that this could not have been done. Assuming Ibarra could not arrange for the

removal of his own vehicle, the court finds that a less intrusive move of the vehicle was a reasonable alternative to impoundment. If safety was the real concern, the vehicle was capable of mobility and a slight move to the right could have placed it in a safer location where it could have been left parked with its doors locked and with Ibarra keeping the keys. In the final analysis, however, and in obvious contrast to *Opperman,* the defendant here was capable of making other arrangements to safeguard his property. If a need in fact existed for Ibarra to move the vehicle, he was plainly capable of making those arrangements with a private towing "service of his choice to a destination of his choice and he was present and physically capable of making the arrangements for the safekeeping of his belongings." *State v. Travitz,* 140 Ga. App. 351, 231 S.E.2d 127, 128 (1976) (impoundment unnecessary where the driver is present and capable of arranging for the care of an immobilized vehicle).

The statute upon which the government relies does not permit the police to seize a vehicle when the driver is without a driver's license. The government, however, asserts that the statute must be read "to fit the reality of the situation." Here, Ibarra was from another state and was driving with a suspended driver's license in Wyoming. Further, he had no liability insurance. Thus, according to the Government, if Ibarra had been allowed to make his own arrangements regarding the disposition of his car, he probably would have driven it away before renewing his license and obtaining liability insurance. The Government's argument is speculative and ignores Ibarra's clear right to control the disposition of his property. He did not lose that right simply because his license was under suspension. In Wyoming, having a valid driver's license is not a prerequisite to owning a motor vehicle. The same is true for liability insurance. Further, the insurance problem was irrelevant to Mahaffey's decision to seize the vehicle because he discovered it after he had called the wrecker and separated Ibarra from his vehicle. The court concludes that the impoundment was not prompted by reasonable necessity and was clearly unlawful. Therefore, any inventory search conducted pursuant thereto was unreasonable and in violation of the fourth amendment.

 Even assuming, however, the impoundment was proper the court finds that the contraband would not necessarily have been discovered pursuant to an inventory search. Unlawfully seized evidence is admissible where it inevitably would have been discovered in the same condition by an independent, lawful police investigation. *Nix,* 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984); *United States v. Owens,* 782 F.2d 146, 152 (10th Cir.1986). In *Nix* the defendant led police to the body of a ten year old girl whom the defendant had murdered. The court held that the evidence of the body and its condition was admissible even though the police found the evidence by unconstitutionally eliciting admissions from the defendant. The body would have been discovered without the defendant's admissions because an active police search was quickly approaching the location of the body and therefore the evidence would have been discovered in any event. The court recognized that the inevitable discovery doctrine created a needed exception to the exclusionary rule because the doctrine ensured that "the interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a *worse,* position that they would have been in if no police error or misconduct had occurred." *Nix,* 467 U.S. at 443, 104 S.Ct. at 2508 (emphasis in original).

The Government now argues that the unlawfully seized evidence is admissible because Mahaffey would have discovered it lawfully when he conducted an inventory search of the impounded vehicle. Although under *Opperman* it would have been proper to conduct an inventory search of Ibarra's vehicle incident to a *lawful* impoundment, it does not follow that an inventory search was inevitable. To prevail on its inevitable discovery argument, the government must show not only that the

officer's inventory search of the vehicle would have led to the discovery of the cocaine, but also, and even more important to fourth amendment analysis, "that it was inevitable that such a search would be conducted." *United States v. Gorski,* 852 F.2d 692, 696 (2d Cir.1988). *See also Hellman,* 556 F.2d at 444 (inventory search unlawful where it was not the routine practice of the searching officer). In *Gorski* the defendant was convicted of a drug offense. After FBI agents arrested and handcuffed the defendant, they illegally searched his bag and found the contraband that led to his conviction. In responding to the Government's argument that the evidence was admissible under the inevitable discovery rule in that an inventory search would have been performed during the defendant's booking, the court noted that "[a] thorough review of the record reveals no evidence that such searches were an invariable, routine procedure in the booking and detention of a suspect at the particular FBI office involved." *Id.* The Second Circuit remanded the case to the district court for an evidentiary hearing on this factual issue.

At the evidentiary hearing held in this case, Mahaffey testified at great lengths concerning when he conducts an inventory search and the extent of his searches. He testified that he generally impounds and inventories a vehicle whenever the driver is arrested or the car has become disabled by an accident. Neither condition occurred here. In describing the depth of his inventory searches, Mahaffey testified that he generally looks into almost every conceivable place where valuables can be hidden. This includes looking under the engine hood and even into the air filter. He also looks into the spare tire well because one time approximately three years ago he found a box in a spare tire well containing $7,000 worth of jewelry. When questioned about specific instances of impoundment, Officer Mahaffey testified about many occasions in which he had impounded vehicles but failed to conduct an inventory. For example, in January 1988, Mahaffey took into custody a Raleigh Sheer, Jr. Sheer's vehicle was towed and impounded. He

stated, however, that he did not recall inventorying that vehicle.

In April 1988 Mahaffey was involved in the arrest of a Kenneth Elsten. Evidently Elsten had been in a vehicular accident on I–80 at the time of his arrest by Sgt. Dennis Wilson. Mahaffey, who was on the scene, had the vehicle towed and impounded at a private wrecking service. Mahaffey, however, did not inventory the vehicle.

In April 1988 Mahaffey took into custody an Irving Couch. Although Couch's car was towed and impounded, Mahaffey did not inventory the vehicle. He explained that the vehicle was a hatchback and that he did not need to inventory it because he could see there was nothing to inventory. Evidently the glove box was open. Although there was no evidence concerning whether the engine hood was open, Mahaffey apparently did not look under it or into the air filter. Nor did he check the spare tire area.

In October 1988 Mahaffey arrested a David Farrington who was evidently AWOL from the United States Navy. Farrington's car was towed to Warren Air Force Base in Cheyenne, Wyoming, where it was turned over to military police. Thus, Mahaffey evidently did not have to inventory Farrington's vehicle.

On December 1, 1988, Mahaffey arrested a Ronald Jensen. Jensen's vehicle was towed and impounded. Mahaffey, however, did not inventory it because it had been severely damaged in an accident, making it difficult for him to gain access to the car's passenger compartment without great expense to the vehicle's owner. Mahaffey did not state whether he conducted an inventory search of the engine compartment to look into the car's air filter.

On February 27, 1989, Mahaffey stopped a vehicle on I–80 for speeding. After being informed by the dispatcher that the vehicle was wanted in connection with a runaway girl from California, a Latanya Ayres, Mahaffey arrested the driver. Both the vehicle and its occupants were turned over to the Laramie County Sheriff's Department. Mahaffey again did not inventory the ve-

hicle, presumably because he turned it over to the sheriff's department.

On May 4, 1989, Mahaffey was dispatched to the Lone Tree service station in Albany County because of a report he received of a vehicle fire. Upon arriving, he observed that a vehicle in fact had been on fire and that its contents were scorched. The car was impounded near the scene. Mahaffey stated he did inventory this vehicle. This is the only specific incident involving an impoundment and inventory described by the officer.

Also in May 1988 Mahaffey arrested Donald Jones for driving while intoxicated. The vehicle was towed and impounded but Mahaffey did not inventory it because it was obvious to him there was nothing to inventory. Evidently, the trunk was open as well as the glove box and the spare tire was on the ground. Although Mahaffey testified that his inventory searches are generally very detailed, he evidently was unconcerned about conducting this type of an inventory search on this occasion. The air filter, which was evidently intact, was not searched.

Finally, on May 10, 1989, he stopped a person by the name of Singlethy, who had been traveling on I–80. Evidently Mahaffey stopped him because an NCIC check revealed that the car's license plate was stolen from Sacramento, California. No evidence was offered on whether the plate was in fact stolen. Apparently it was not because Singlethy was not arrested. Singlefy did not have a driver's license but his passenger did. Thus, Mahaffey did not seize the vehicle.

Although it may be the policy of the Wyoming Highway Patrol to inventory vehicles it impounds, it is clear from the evidence that it is not necessarily the routine practice of officer Mahaffey. The court finds that the government has not met its burden of showing that it was inevitable that Mahaffey would have conducted an inventory search of Ibarra's vehicle. Instead, the evidence indicated that such searches were not an invariable routine procedure of this officer. As the Ninth Circuit noted in *Hellman*, inventory searches are reasonable only when it is shown to be the routine practice of both the particular police department as well as the individual officer involved in the search. 556 F.2d at 444. Adhering to the "practice gives some assurance that a particular car was not singled out for special searching attention. Absent such assurance some special reason for the taking of safeguarding or security precautions that are not customarily taken should exist if the intrusion resulting from the taking of such precautions is to be rendered reasonable under the fourth amendment." *Id.*

■ Finally, even assuming that the inventory search was inevitable, which the court finds it was not, the government still must show that it was motivated by "non-investigatory purposes." *Hellman,* 556 F.2d 443–44. Although Mahaffey testified he intended to impound Ibarra's vehicle, he later stated under questioning from the court that he thought he was searching the vehicle pursuant to a continuing consent. His testimony is consistent with Officer Leazenby's report, which states that the intent of the officers was to take custody of the vehicle so that they could search it in a more secure location. Particularly, Leazenby was interested in searching the spare tire area because he had noticed some plastic bags under the spare tire. In its supplemental memorandum filed with this court, the government states that Mahaffey had removed Ibarra's suitcases from the trunk of the car "in order to facilitate their inventory." Mahaffey continued his search of the trunk principally near the spare tire where Leazenby had noticed the plastic bags. While Leazenby began a search of the suitcases for firearms, large sums of money and controlled substances, that is, for possible instrumentalities of crime, fruits of a crime and, of course, contraband. Thus, both the investigatory search as well as the inventory search overlapped each other. The court is compelled to conclude that the inventory search, assuming it was inevitable, was tainted by an investigatory motive making it unreasonable under the fourth amendment. In light of the court's decision, it need not address the issue whether Ibarra freely and voluntarily consented to the first search.

The defendant also has moved to suppress a statement he made to agents of the Wyoming Division of Criminal Investigation soon after his arrest. Although he made the statement after he was given his *Miranda* warnings, the defendant asserts it must be suppressed because the statement was "fruit of the poisonous tree." The court agrees. Evidence generally is fruit of the poisonous tree whenever it is obtained as a result of prior police misconduct. *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). It is well-established that the "[e]xclusionary rule applies not only to the illegally obtained evidence itself, but also to other incriminating evidence derived from the primary evidence." *Nix,* 467 U.S. at 441, 104 S.Ct. at 2507. The question that must be asked in determining whether evidence is fruit of the poisonous tree is " 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinquishable to be purged of the primary taint.' " *Wong Sun,* 371 U.S. at 488, 83 S.Ct. at 417 (quoting Maguire, *Evidence of Guilt* at 221 (1959). The defendant made this statement soon after he was arrested and taken into custody. He would not have been arrested but for the prior police misconduct and clearly no intervening, attenuating event occurred to dissipate the taint.

The defendant has asked the court to quash the Indictment against him evidently because the evidence leading to the Indictment was illegally obtained. It would appear that the defendant's remedy would be to ask the court that it release him on bail from pretrial detention. Now, in accordance with this opinion,

IT IS HEREBY ORDERED that the defendant's motion to suppress all evidence seized during the search and as a result of the search, including all statements obtained from him after his arrest, be, and the same hereby is, GRANTED.