**UNITED STATES of America, Plaintiff,**

v.

**Christopher Gregory ROTH, Defendant.**

**No. 96–CR–069–D.**

United States District Court,
D. Wyoming.

Sept. 6, 1996.

John R. Green, Assistant U.S. Attorney, U.S. Attorney's Office, Cheyenne, WY, for Plaintiff.

Thomas William Rumpke, Rose & Rose, Cheyenne, WY, for Defendant.

## ORDER GRANTING MOTION TO SUPPRESS

DOWNES, District Judge.

This matter having come before the Court on Defendant's Motion to Suppress Evidence, and the Court, having considered the briefs submitted in support of the motion and the government's response thereto, having heard testimony of witnesses and oral argument of counsel, and being otherwise fully advised in the premises, FINDS and ORDERS as follows:

### BACKGROUND

In the late afternoon of March 29, 1996, the Defendant, Christopher Gregory Roth, arrived at the Arlington Outpost ("the Outpost"), a commercial roadway service area located on Interstate 80 in Carbon County, Wyoming. Roth pulled into the service island and filled his pickup truck with gas. An employee of the Outpost observed the Defendant checking something underneath the hood of the truck. Shortly thereafter, an unidentified patron entered the store and advised the employees/operators of the Outpost that someone was having a seizure outside. One of the Outpost operators, who has had Emergency Medical Technician ("EMT") training, then ran out and observed the Defendant having convulsions. The operator told his wife to call an ambulance, which she did. A few minutes later, after the Defendant began to "come around," the Outpost operator and the unidentified patron guided the Defendant into the back of the store where he could lie down on the floor. The testimony indicated that the Defendant was still somewhat disoriented at this time, however his level of orientation was increasing as time passed and he was answering at least some questions appropriately.

Ambulance personnel arrived approximately 25 minutes later and observed Defendant still lying on the floor of the store with several people standing around him. One of the EMTs who attended to Defendant, Patricia Gregory, testified that when they first

arrived on the scene Defendant was "slightly disoriented," pale, agitated, and slow in responding to her initial questions. Defendant's condition was thought to be generally the same as other patients who have experienced a seizure. Witnesses testified that the Defendant became more alert and focussed as time passed and did respond to questions with appropriate answers. When Patrolman Bauer of the Wyoming Highway Patrol ("WHP") arrived on the scene, within only a few minutes after the ambulance personnel arrived,[1] he observed the ambulance and the Defendant's pickup which was still parked at the service island. Inside, the patrolman observed medical personnel working on a man lying on the floor. As the patrolman approached Defendant, he noticed an obvious change in Defendant's demeanor in that Defendant appeared to become more nervous.

Patrolman Bauer claims he then asked about the Defendant's identification.[2] The Defendant responded by feeling his pockets as if he was looking for his wallet. The patrolman went to the pickup still parked at the island, opened the door, and found a license in a wallet on the seat. The patrolman identified the man lying on the floor in the store as the same man pictured on the license. The Defendant's perceived nervous response to the patrolman's presence had caused the officer to be somewhat suspicious. Consequently, Patrolman Bauer ran a NCIC check on the Defendant and the vehicle. He was advised that the license was valid, there were no warrants out for the Defendant and the pickup truck was registered to the Roth family. Patrolman Bauer testified that following this check he had no further suspi-

cions that the Defendant was involved in any criminal activity.

Patrolman Bauer went back inside the store and observed the medical personnel still treating and evaluating Defendant Roth. As the patrolman gave the identification information to one of the EMTs, Patricia Gregory asked Roth if he would allow the EMTs to transport him to a hospital. Roth consented to the transport but expressed concern for his truck, and particularly for his cellular phone and pager which he asked to be put in the glove box. Hearing this, Patrolman Bauer asked Ronnie Newkirk, operator of the shop and wrecker portions of the Outpost business, whether the vehicle could be stored at the Outpost's shop. Since part of the Outpost's business involves a towing service, its operators had previously stored vehicles in their shop. Mr. Newkirk agreed to store the vehicle. The patrolman then advised Roth, through EMT Patricia Gregory,[3] that his vehicle would be stored at the Outpost and he would do an inventory to secure any possessions in it. The patrolman made arrangements for Mr. Newkirk to drive Roth's vehicle across the street, apparently with Roth's consent, in order to avoid any towing fees. Patrolman Bauer followed Mr. Newkirk to the Outpost shop in his patrol car. Roth was taken by ambulance to the hospital in Laramie, Wyoming, approximately a 25–30 minute drive from the Outpost.

Once the vehicle was in the shop, Patrolman Bauer began to inventory it, pursuant to his understanding of WHP policy, using a WHP inventory form. Mr. Newkirk participated in the inventory process. Patrolman Bauer testified that it was WHP policy to open any containers in order to account for

1. Patrolman Bauer testified that he arrived at the Outpost at approximately 5:33 p.m.

2. The testimony on this issue was somewhat conflicting. Patrolman Bauer and witness Richard Gregory, Fire Chief for the Hanna Fire Department who also participates in ambulance calls, testified that one of the EMTs treating the Defendant, Patricia Gregory, asked the Defendant for identification and the location of his wallet. These same two witnesses testified that the Defendant answered that his wallet was in his vehicle and indicated it was all right for Patrolman Bauer to look in his vehicle for his driver's license. However, Mrs. Gregory testified that

Patrolman Bauer asked for the Defendant's identification and that she had no discussion with the Defendant regarding his identification. Given that Mrs. Gregory was the person talking directly to the Defendant, the Court finds her testimony more persuasive. In any event, the resolution of this issue is not determinative of the Court's conclusion on the motion to suppress.

3. Although muddled on this point, the testimony revealed that Patrolman Bauer never spoke directly to or with Defendant Roth. Rather, the patrolman's questions/statements were relayed to Roth through the EMT, Patricia Gregory.

any valuables possibly contained therein. The patrolman eventually observed a used paint can on the floor of the truck, picked it up and shook it. Upon finding that the can was heavier than expected and that its contents did not "swish" as one would expect of a liquid, the patrolman had Mr. Newkirk open the can while he continued the inventory. Not recognizing the can's contents, Mr. Newkirk told the patrolman to come take a look. Patrolman Bauer found the can to be tightly packed with small plastic packages containing what he suspected to be methamphetamine. After conferring about the substance with an agent from the Department of Criminal Investigation over the phone, Patrolman Bauer sealed the truck with red tape and had Mr. Newkirk tow the vehicle to an impound yard in Rawlins, Wyoming. The patrolman placed all of the items he had found in Roth's truck into a carry-all bag and transported it in his patrol car to the Rawlins Police Department.

Defendant Roth was subsequently charged by indictment with possession with intent to distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A). Defendant has moved to suppress all the evidence obtained by Patrolman Bauer from the warrantless search of the Defendant's truck on March 29, 1996. Defendant contends that the government cannot meet its burden of showing that any judicially recognized exception to the warrant requirement of the Fourth Amendment to the United States Constitution applies here. The government contends that Patrolman Bauer's actions were reasonable and fall within an exception to the Fourth Amendment's warrant requirement in that the Defendant consented to the search and the search was an inventory of a vehicle conducted pursuant to WHP policies.

## DISCUSSION

The Fourth Amendment to the United States Constitution prohibits, with few exceptions, police from conducting searches without a warrant issued by a detached and neutral magistrate or court upon probable cause. "The security of one's privacy against arbitrary intrusion by the police—which is at the core of the fourth amendment—is basic to a free society." *United States v. Ibarra*, 725 F.Supp. 1195, 1198 (D.Wyo.1989) (quoting *Wolf v. Colorado*, 338 U.S. 25, 27, 69 S.Ct. 1359, 1361, 93 L.Ed. 1782 (1949)). "To give effect to the fourth amendment's guarantee against unreasonable searches and seizures, and to deter illegal police conduct, the court must apply the exclusionary rule and suppress any evidence unconstitutionally obtained." *Ibarra*, 725 F.Supp. at 1198 (citing *Nix v. Williams*, 467 U.S. 431, 442–43, 104 S.Ct. 2501, 2508–09, 81 L.Ed.2d 377 (1984)). The two exceptions to the Fourth Amendment's warrant requirement which are implicated in this case are: (1) a warrantless inventory search of a vehicle conducted after the vehicle has been lawfully impounded by police, *South Dakota v. Opperman*, 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976); and (2) a warrantless search done pursuant to consent, *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043–44, 36 L.Ed.2d 854 (1973).

■ The Court examines first Roth's argument that the search was not a lawful inventory of the vehicle because the vehicle was not in lawful custody of the WHP. "An inventory search will be upheld only if it is reasonable under the fourth amendment in light of the facts and circumstances of the particular case." *Ibarra*, 725 F.Supp. at 1200 (citing *Opperman*, 428 U.S. at 375, 96 S.Ct. at 3100). An inventory search is a routine procedure designed to effect three distinct purposes: the protection of the owner's property *while it remains in police custody*; the protection of police against claims of lost, stolen or vandalized property; and the protection of the police from danger. *Opperman*, 428 U.S. at 368–70, 96 S.Ct. at 3097; *see also Colorado v. Bertine*, 479 U.S. 367, 372, 107 S.Ct. 738, 741, 93 L.Ed.2d 739 (1987). The Supreme Court has consistently "accorded deference to police caretaking procedures designed to secure and protect vehicles and their contents *within police custody*." *Bertine*, 479 U.S. at 372, 107 S.Ct. at 741 (emphasis added); *see also Opperman*, 428 U.S. at 373, 96 S.Ct. at 3099 ("this Court has consistently sustained police intrusions into automobiles *impounded or otherwise in lawful police custody* where the process is

aimed at securing or protecting the car and its contents") (emphasis added).

The government argues that Patrolman Bauer appropriately conducted an inventory of Roth's vehicle pursuant to the WHP's policies and procedures in order to protect Roth's vehicle and its contents. "When the police acquire temporary custody of a vehicle, a warrantless inventory search of the vehicle does not offend Fourth Amendment principles so long as the search is made pursuant to 'standard police procedures' and for the purpose of 'protecting the car and its contents.'" *United States v. Lugo*, 978 F.2d 631, 636 (10th Cir.1992) (citing *Opperman*, 428 U.S. at 369, 96 S.Ct. at 3097). The government submitted two documents which it contends authorize the inventory conducted by Patrolman Bauer. The first is a Wyoming Highway Patrol Operational Memorandum dated November 1, 1989, relating to property inventory. The memorandum provides in part as follows:

> Whenever a Patrolman takes charge of a vehicle he is also responsible for the safety of its contents to a reasonable degree. Inasmuch as there is this responsibility, he should be aware of the identity and condition of the property within the vehicle. In order to do this the Patrol property inventory form (P–22) is to be used.
>
> An inventory of the vehicle shall be conducted and all property or articles therein listed on the form as designated. If the property is transferred back to the owner or another party for safe keeping, the release on the form should be signed for the protection of the officer.

(Gov't Ex. 2.) The second document relates to the custody of vehicles and inventories pursuant to stop and arrest procedures. This document provides in part:

> III. *Custody of Vehicles*
>
> *When a driver is taken into custody*, his vehicle shall be towed to a place of safe-keeping or released to a lawful owner or other responsible party at owner's request, if party agrees. If the driver is incapable of making a sound decision ... the vehicle shall be towed to a place of safe-keeping or released to an owner or co-owner.
>
> IV. *Inventories*
>
> A. *When a vehicle is towed to a place of safe-keeping as provided above*, it and its contents shall be inventoried and recorded on the proper form. The inventory shall also include the inspection of closed and sealed containers.

(Gov't Ex. 3) (emphasis added). The Court finds that Patrolman Bauer did not act in accordance with the procedures contained in this second document. Although the policy requires the inspection of closed and sealed containers, the patrolman did not have authority under this policy to take custody of the vehicle. Initially, Mr. Roth was not taken into custody. And even if he had been, the patrolman had made arrangements to release the vehicle to an "other responsible party" with the consent of Mr. Roth and did not have the vehicle towed to a place of safe-keeping within the control of the WHP. Thus, the pivotal issue in this case is whether the vehicle was otherwise in lawful police custody.

"[A]n inventory search is reasonable only where the initial taking of custody of the vehicle has been considered lawful...." *Ibarra*, 725 F.Supp. at 1201. The taking custody, or impoundment, of a vehicle is lawful if it was prompted by "some reasonable necessity." This Court has previously adopted the following reasoning set forth in *State v. McDaniel*, 156 N.J.Super. 347, 383 A.2d 1174 (1978):

> The common theme underlying these cases and others is that something more must be shown to justify impoundment of a car than that it would otherwise be left unattended. There must be a showing that some reasonable necessity prompted the impoundment. This is a salutary rule, for otherwise police would be authorized to freely stop a car for a minor traffic infraction, impound it and search it with impunity. Surely such a circumstance is not consonant with the fourth amendment.

*Ibarra*, 725 F.Supp. at 1200 (Johnson, C.J.) (quoting *McDaniel*, 383 A.2d at 1179). The government argues that Roth's vehicle was lawfully taken into police custody pursuant to the "community caretaking" function routine-

ly undertaken by local police officers. *Lugo,* 978 F.2d at 635 (citing *Cady v. Dombrowski,* 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973)).

> Noninvestigatory searches of automobiles pursuant to this function ... do not offend Fourth Amendment principles so long as such activities are warranted "in terms of state law or sound police procedure," and are justified by "concern for the safety of the general public who might be endangered if an intruder removed" a weapon which police reasonably believed was present and located in a part of the vehicle vulnerable to vandals.

*Lugo,* 978 F.2d at 635 (quoting *Cady,* 413 U.S. at 447–48, 93 S.Ct. at 2531). This Court finds that none of the foregoing justifications are present in this case. The government cited to no statute which authorizes taking custody of a vehicle in these circumstances, and as discussed *supra,* taking custody of Roth's vehicle was not authorized by police procedure. Furthermore, there is no evidence that Patrolman Bauer reasonably believed a weapon was present and located in the vehicle. In any event, arrangements had been made for the owner of the nearby shop to store the vehicle, which is part of the shop owner's regular course of business. Testimony at the hearing established that this shop was kept locked with only the owners having access. Thus, Roth's vehicle would not have been vulnerable to vandals.

■ The government additionally contends that it was reasonable for Patrolman Bauer to inventory the vehicle to protect the owners of the shop against false claims of theft or dangerous instrumentalities. *See Bertine,* 479 U.S. at 373, 107 S.Ct. at 742. Under the circumstances of this case, the Court disagrees. The owners of the Outpost were, in fact, in the business of towing and storing vehicles. Certainly they were knowledgeable of the proper measures necessary to protect themselves from false claims of theft and to protect the vehicle owner's property while in their custody. Furthermore, there was no testimony that the Outpost owners requested the patrolman to inventory the vehicle for *their* protection. The testimony was clear that arrangements were made

for both the moving and storage of Roth's vehicle by a private party. Therefore, the Court finds that there was no reasonable necessity for Patrolman Bauer to take custody or "charge" of Mr. Roth's truck and conduct an inventory of it. *See United States v. Pappas,* 735 F.2d 1232 (10th Cir.1984).

■ The government also argues that Patrolman Bauer received permission from Defendant to inventory his truck. The government alleges that the patrolman fully informed the Defendant that he would inventory the items in the truck. The Court disagrees. "[V]oluntariness is a question of fact to be determined based on the totality of the circumstances." *United States v. Manuel,* 992 F.2d 272, 275 (10th Cir.1993). The testimony indicated that the patrolman told the Defendant, through one of the treating EMTs, that he would do an inventory to account for the Defendant's possessions. No further explanation of what the patrolman meant by an "inventory" was given to Defendant. Certainly Defendant was not informed that the inventory would include the inspection of all closed and sealed containers. Additionally, at the time the patrolman "informed" Defendant an inventory would be done, Mr. Roth understood that his truck would be stored at the Outpost and not by the WHP. Therefore, the Court finds that Defendant was not fully informed of the type of search, or "inventory," that was going to be conducted and by whom. In any event, Patrolman Bauer did not ask Defendant's permission to inventory the truck; rather, the patrolman told the Defendant that an inventory would be done without indicating that Defendant could refuse consent to such a search. "Mere submission to lawful authority does not equate to consent, rather valid consent must be unequivocal and specific, and freely and intelligently given." *Id.* In considering the totality of the circumstances in this case, the Court cannot find that Defendant voluntarily consented to the inventory/search conducted by Patrolman Bauer.

### CONCLUSION

Opining a Fourth Amendment violation and applying the exclusionary rule to sup-

press unlawfully obtained evidence is often an odious task for a judge. That is so in this case. Undeniably, this Defendant was engaged in the criminal trafficking of illegal drugs when he suffered his inopportune seizure. Furthermore, Officer Bauer's conduct was unquestionably well-motivated and it had the satisfying result of seeing these illicit drugs confiscated. Yet, good faith intentions by the police coupled with bad intentions of the defendant cannot serve to dull judicial senses to the adherence to the Fourth Amendment. Neither can the Fourth Amendment be dismissed as a legal nuisance. It is instead a cornerstone of our rights and the fact that it often comes to the aid of our less desirable citizens makes it no less so. It is, after all, those who call police attention to themselves who most often are in need of its protection. Yet, if judges, in order to avoid results such as this, equivocate in its enforcement, the rights of all citizens are thereby denigrated.

THEREFORE, it is

**ORDERED** that the Defendant's Motion to Suppress Evidence is hereby **GRANTED.**