**UNITED STATES of America**

v.

**Frederick DOE.**

**No. 6:92 CR 2.**

United States District Court,
E.D. Texas,
Tyler Division.

July 24, 1992.

---

Tonda Curry, Asst. U.S. Atty., Tyler, Tex., for plaintiff.

Jeff L. Haas, Tyler, Tex., for defendant.

## MEMORANDUM OPINION

JUSTICE, District Judge.

On the evening of March 30, 1991, defendant was traveling northbound in an auto-

mobile on U.S. Highway 69. He was returning to his residence in Tyler, Texas, from a day long visit to his aunt in the Houston area, accompanied by two friends, Kelvin Williams and Roderick Kellum. All three vehicle occupants were African–American juveniles. Defendant was operating a maroon and black Chevrolet Z–28 Camaro, and had just driven the car into a Chevron "Fast Fill" station located in Rusk, Texas, approximately one-half mile north of the intersection of U.S. 69 and U.S. 84. Rusk Police Department Patrol Officer Otis Crow was riding that evening with reserve officer Kurt Nolan. Crow had observed defendant make a "rolling stop" at the intersection of U.S. 69 and U.S. 84. Officer Crow stopped his vehicle in front of the defendant's car, which was parked parallel to the curb in front of the convenience store. After a series of events that are in dispute, Officer Crow obtained from defendant's vehicle a large amount of cocaine, a firearm, and a box of ammunition. Defendant argues the evidence seized from his vehicle cannot be admitted without violating the Fourth Amendment.

### I. *Procedural History*

This is a federal juvenile delinquency proceeding governed by 18 U.S.C. §§ 5031–5042 (1992). "Juvenile delinquency" is the violation of a law of the United States committed by a person prior to his eighteenth birthday, which would have been a crime if committed by an adult person. 18 U.S.C. § 5031. Federal juvenile proceedings must occur in an appropriate district court, which may be convened at any time or place within the district, in chambers, or

otherwise. 18 U.S.C. § 5032. On January 21, 1992, the United States Attorney for the Eastern District of Texas filed, under seal, an information against the defendant, Frederick Doe.[1] The two-count information charged him with a violation of 21 U.S.C. § 846 (conspiracy to violate a controlled substance law) and 21 U.S.C. § 841(a)(1) (possession of a controlled substance with intent to distribute).

After several postponements,[2] Doe's juvenile delinquency hearing was scheduled for April 27, 1992. Although defendant did not file a motion to suppress until the day of trial, the government had previously been apprised of the defendant's intention to move for suppression, and had agreed to combine the suppression hearing with the juvenile delinquency adjudication, since both were to be tried before the court without a jury. But for the absence of a jury, the delinquency proceeding was conducted in the same manner as any criminal case,[3] although considerable time was spent upon the issues raised by defendant's suppression motion. Only the government introduced evidence at the hearing.

For the reasons articulated below, it is concluded that all of the evidence offered against the defendant at his juvenile delinquency proceeding was obtained as a result of a search and seizure conducted in violation of the Fourth Amendment. Without the illegally obtained evidence, the government cannot prove beyond a reasonable doubt that defendant committed an act of juvenile delinquency, as is required by *In re Winship*, 397 U.S. 358, 368, 90 S.Ct. 1068, 1075, 25 L.Ed.2d 368 (1970), and

---

**1.** Section (e) of 18 U.S.C. § 5038 states that neither the name nor picture of the juvenile shall be made public in connection with a juvenile delinquency proceeding. Therefore, the defendant's last name will not be revealed in the instant opinion.

**2.** A juvenile's speedy trial rights are controlled by 18 U.S.C. § 5036, which provides for a hearing within thirty days of the filing of charges. *United States v. Doe*, 882 F.2d 926 (5th Cir.1989). In accordance with the statute, defendant consented, on February 7, 1992, to a trial date beyond the thirty-day limit. The proceeding was next set for March 2, 1992, and then moved to March 4, 1992, at the request of the defen-

dant. On March 4, 1992, the government's motion for a further continuance was granted, because it was found that any delay in the proceedings had been caused by the defendant and a continuance was in the interests of justice. 18 U.S.C. § 5036; *Doe*, 882 F.2d at 929.

**3.** Juvenile delinquency proceedings originated as informal "paternalistic" proceedings but have become very similar to their adult criminal counterparts through the years. Douglas A. Bahr, *Associated Press v. Bradshaw: The Right of Press Access Extended to Juvenile Proceedings in South Dakota*, 34 S.D. L.Rev. 738 (1989).

*United States v. De Leon,* 768 F.2d 629, 631 (5th Cir.1985). In the usual case, the government would be afforded the opportunity to appeal an adverse decision on a motion to suppress before the conclusion of trial. 18 U.S.C. § 3731. However, the trial in this case has already been held. To avoid any possible violation of the double jeopardy clause of the Fifth Amendment, and in the interests of justice, no judgment of acquittal will be entered at this time. Rather, the government will be given thirty days from the entry of the order granting suppression to file a notice of appeal. Fed. R.App.P. 4(a). If no appeal is taken within such time, or the appeal notice is subsequently dismissed, a judgment of acquittal will be entered.

## II. *Application of the Exclusionary Rule to Juvenile Proceedings*

### A. No Federal Case Has Determined Whether the Rule Applies

█ While no federal court has addressed directly the exclusionary rule's application to juvenile delinquency proceedings,[4] the Supreme Court has extended the search and seizure protections of the Fourth Amendment to juveniles. *New Jersey v. T.L.O.,* 469 U.S. 325, 333, 105 S.Ct. 733, 738, 83 L.Ed.2d 720 (1985). The United States Court of Appeals for the Fifth Circuit has held that the Fourth Amendment requires that a juvenile arrested without a warrant be provided a *Gerstein v. Pugh,* 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975), probable cause hearing. *Moss v. Weaver,* 525 F.2d 1258, 1259–60 (5th Cir.1976). Thus, it is manifest that the Fourth Amendment applies to juveniles. *See also Kimmelman v. Morrison,* 477 U.S. 365, 374, 106 S.Ct. 2574, 2582, 91 L.Ed.2d 305 (1986) (Fourth Amendment is not a trial right; its protections pertain to all). Whether its guarantees should be enforced by means of the exclusionary rule is a separate question. *T.L.O.,* 469 U.S. at 333 n. 3, 105 S.Ct. at 738 n. 3.

In *United States v. Sechrist,* 640 F.2d 81 (7th Cir.1981), the United States Court of Appeals for the Seventh Circuit adjudicated a motion to suppress evidence filed in the course of a juvenile delinquency proceeding. The appellate tribunal apparently presumed the exclusionary rule would have applied, but it perceived no Fourth Amendment violation. 640 F.2d at 86–87. Likewise, in evaluating a juvenile's motion to suppress statements allegedly elicited in violation of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the United States Court of Appeals for the Ninth Circuit implicitly accepted that suppression was possible, but found no violation. *United States v. Indian Boy X,* 565 F.2d 585, 592 (9th Cir.1977), *cert. denied,* 439 U.S. 841, 99 S.Ct. 131, 58 L.Ed.2d 139 (1978).

All state courts to have considered this issue have concluded that the exclusionary rule applies in juvenile delinquency adjudications, and evidence obtained by means of unlawful searches conducted by police officers is inadmissible. The Supreme Court of California in *In re Scott K.,* 24 Cal.3d 395, 155 Cal.Rptr. 671, 595 P.2d 105, *cert. denied,* 444 U.S. 973, 100 S.Ct. 468, 62 L.Ed.2d 388 (1979), reversed a juvenile delinquency finding because the evidence against the juvenile had been seized illegally. The Justices held that juveniles are entitled to the "[e]nforcement of search and seizure protections [to help] ensure that the factfinding process conforms with the standards of due process." *Id.,* 155 Cal.Rptr. at 675, 595 P.2d at 109. The Supreme Court of Illinois has also commanded that juveniles have a right to invoke the exclusionary rule in juvenile proceedings. *In re Marsh,* 40 Ill.2d 53, 237 N.E.2d 529 (1969). Lower level appellate

4. Although the government was made aware of the uncertainty of the law on this point, it deliberately chose not to pursue an argument that the exclusionary rule did not apply in a juvenile delinquency proceeding. However, given the dearth of federal authority on this question, and the duty of the court to confront whether it has the power to grant the relief demanded of it, the question of the application of the exclusionary rule to juvenile delinquency proceedings will be addressed.

courts have reached the same result in six other states.[5]

### B. The Exclusionary Rule Should Apply to Juvenile Delinquency Adjudication Hearings

#### 1. *The Nature of Juvenile Delinquency Adjudications*

"[D]etermining the relevance of constitutional policies, like determining the applicability of constitutional rights, in juvenile proceedings, requires that the courts eschew 'the "civil" label-of-convenience which has been attached to juvenile proceedings,' and that the juvenile process ... be candidly appraised." *Breed v. Jones*, 421 U.S. 519, 529, 95 S.Ct. 1779, 1785, 44 L.Ed.2d 346 (1975) (citations omitted). In *In re Gault*, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967), the Court ruled that the rights of counsel, confrontation, and cross-examination, and the privilege against self-incrimination applied because the likely consequences of a juvenile delinquency proceeding were the same as those of a criminal trial: incarceration in a state institution. 387 U.S. at 36, 49–50, 87 S.Ct. at 1448, 1455 ("To hold otherwise would be to disregard substance because of the feeble enticement of the 'civil' label-of-convenience which has been attached to juvenile proceedings").

In the quarter century since *Gault*, the Court has not retreated from its recognition that the potential penalties for being adjudicated a juvenile delinquent are on par with those resulting from a criminal conviction: "[T]hat the purpose of the commitment is rehabilitative and not punitive ... [does not] change its nature.... Regardless of the purposes for which the incarceration is imposed, the fact remains that it is incarceration." *Breed v. Jones*, 421 U.S. at 530 n. 12, 95 S.Ct. at 1786 n. 12 (citation omitted). *Cf. Allen v. Illinois*, 478 U.S. 364, 373–74, 106 S.Ct. 2988, 2994, 92 L.Ed.2d 296 (1986) (proceedings that could result in commitment of a sex offender to a psychiatric hospital for treatment are not "criminal").

The applicable due process standard in juvenile proceedings is "fundamental fairness". *In re Gault*, 387 U.S. at 19–20, 30, 87 S.Ct. at 1439, 1445. The United States Supreme Court, in cases since *Gault*, has blurred the distinctions between juvenile delinquency proceedings and adult criminal proceedings by imposing those aspects of a criminal trial required by fundamental fairness. *E.g.*, *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) ("beyond a reasonable doubt" standard of proof required in juvenile process when the youth's act would be a crime if committed by an adult); *Breed v. Jones*, 421 U.S. at 529, 95 S.Ct. at 1785 (double jeopardy prohibition applies to juvenile proceedings). *See also* Bahr, *supra* note 3.

On the other hand, the Court has not imposed the "formalities of the criminal adjudicative process" on the juvenile system. *McKeiver v. Pennsylvania*, 403 U.S. 528, 551, 91 S.Ct. 1976, 1989, 29 L.Ed.2d 647 (1971) (juveniles do not have a constitutional right to a jury trial); *accord Indian Boy X*, 565 F.2d at 595 (Fifth Amendment does not require indictment to initiate juvenile proceedings). In *McKeiver*, the Court found that the benefits of a juvenile court's ability to function in a "unique manner" outweighed the fact-finding advantages of a jury trial. *McKeiver*, 403 U.S. at 547, 91 S.Ct. at 1987 (plurality opinion). The Court emphasized the cost of jury trial in the context of juvenile proceedings: it would destroy the informal nature of the delinquency adjudication hearing and would bring with it the delay, the formality, and the clamor of the adversary system. *Id.* at 550, 91 S.Ct. at 1988.

#### 2. *The Cost Benefit Analysis of Applying the Rule*

When deciding whether to apply the Fourth Amendment exclusionary rule, the

---

**5.** *S.A.F. v. Florida*, 483 So.2d 110 (Fla.Dist.Ct. App.1983); *Re Montrail M.*, 87 Md.App. 420, 589 A.2d 1318, 1325 (1991), *aff'd on other grounds* 325 Md. 527, 601 A.2d 1102 (1992); *New Jersey ex rel. L.B.*, 99 N.J.Super. 589, 240 A.2d 709, 713 (Union County Juv. and Domestic Rel.Ct.1968); *Re Oniel W.*, 146 A.D.2d 633, 536 N.Y.S.2d 538 (1989); *Ciulla v. State*, 434 S.W.2d 948 (Tex.Civ. App.—Houston [1st Dist.] 1968, no writ); *In the Interest of L.L.*, 90 Wis.2d 585, 280 N.W.2d 343 (1979).

court must analyze the potential costs and benefits of doing so. *United States v. Calandra*, 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974). In decisions subsequent to *Calandra*, the Court has continually articulated that "the 'prime purpose' of the [exclusionary] rule, if not the sole one, 'is to deter future unlawful police misconduct' " *United States v. Janis*, 428 U.S. 433, 446, 96 S.Ct. 3021, 3028, 49 L.Ed.2d 1046 (1976) (quoting *Calandra*, 414 U.S. at 347, 94 S.Ct. at 619). The Supreme Court has applied the exclusionary rule in forfeiture actions, which like juvenile delinquency proceedings, are nominally "civil" cases that are criminal in nature, or "quasi-criminal". *See Boyd v. United States*, 116 U.S. 616, 634, 6 S.Ct. 524, 534, 29 L.Ed. 746 (1886), *overruled on other grounds, Warden v. Hayden*, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967); *One 1958 Plymouth Sedan v. Pennsylvania*, 380 U.S. 693, 701, 85 S.Ct. 1246, 1251, 14 L.Ed.2d 170 (1965). However, the Supreme Court has declined to apply the exclusionary rule in civil tax proceedings and in Immigration and Naturalization Service (INS) deportation proceedings. *Janis; United States v. Lopez–Mendoza*, 468 U.S. 1032, 104 S.Ct. 3479, 82 L.Ed.2d 778 (1984).

In *Boyd*, and in *One 1958 Plymouth Sedan*, the Court found that a civil forfeiture was a "penalty" for a violation of a criminal law and, thereby, a forfeiture action was equivalent to a criminal proceeding for the purposes of the exclusionary rule. In *United States v. U.S. Currency $31,828*, 760 F.2d 228, 230 (8th Cir.1985), the United States Court of Appeals for the Eighth Circuit demonstrated the continued efficacy of the exclusionary rule in civil forfeiture cases, despite the adoption by the Supreme Court of the cost-benefit analysis in *Calandra* and its progeny: *Janis* and *Lopez–Mendoza*. The loss of liberty that may result from an adjudication of juvenile delinquency is no less a penalty for past unlawful conduct than the forfeiture of an automobile.

The factors that counseled the Court to hold the exclusionary rule inapplicable in *Janis* and *Lopez–Mendoza* for want of deterrence value or social benefit do not apply to the juvenile context. In *Janis*, illegally seized evidence was excluded from the defendant's criminal trial. The police then turned over the evidence to the Internal Revenue Service, which filed civil tax proceeding. The Court, utilizing *Calandra's* cost-benefit analysis, ruled that the deterrent effect was diminished under the circumstances. 428 U.S. at 447–60, 96 S.Ct. at 3028–35. Particularly significant was that the state law officials had already been "punished" by the exclusion of the evidence in a state criminal trial, and that the evidence would be excludable in any federal criminal trial that might be held. *Lopez–Mendoza*, 468 U.S. at 1042, 104 S.Ct. at 3485 (analyzing *Janis*).

The *Janis* court drew a distinction between the power of the exclusionary rule to deter intra-sovereign constitutional violations and its efficacy in inter-sovereign situations. 428 U.S. at 456–60, 96 S.Ct. at 3033–35. The Court concluded, under the circumstances presented in *Janis*, that inter-sovereign deterrence would be extremely attenuated. *Id.* However, the *Janis* court reaffirmed the insight of *Elkins v. United States*, 364 U.S. 206, 221–22, 80 S.Ct. 1437, 1446, 4 L.Ed.2d 1669 (1960), that the interest of state law enforcement officers in the criminal proceedings of the federal government counterbalanced any attenuation enough to justify the imposition of the exclusionary rule when a state arrests and the United States prosecutes. 428 U.S. at 458, 96 S.Ct. at 3034.

The *Elkins* rationale has equal force here. The officers conducting the searches in juvenile cases are the same officers who enforce the criminal laws against all persons in widely varied circumstances.[6] The reality is that state law enforcement officers have essentially the same interest in the federal juvenile delinquency proceedings as in criminal prosecutions. The outcome of a juvenile delinquency proceeding,

---

6. *See* Francis B. McCarthy, *Pre–Adjudicatory Rights in Juvenile Court: An Historical and Con-* *stitutional Analysis*, 42 U.Pitt.L.Rev. 457 (1981).

the incarceration of law breaker in an governmental institution, is within the arresting officer's "zone of primary interest." *Janis*, 428 U.S. at 458, 96 S.Ct. at 3034. In such situations, *Janis* recognizes the exclusionary should apply.

The *Lopez–Mendoza* Court found the deterrence value of the exclusionary rule in deportation proceedings much less than in criminal prosecutions for four reasons: First, since the burden of proof shifts from the government to the individual in a deportation proceeding, once identity and alienage have been established, the Court determined there was no significant incentive for INS agents to engage in illegal search and seizures, in that the information necessary to the government's case was readily available elsewhere. 468 U.S. at 1043, 104 S.Ct. at 3485. Second, the Court noted that most illegal aliens agree to voluntary deportation without a hearing; therefore, the majority found that enforcement of the rule was unlikely to influence the conduct of INS officials. *Id.* at 1044, 104 S.Ct. at 3486. Third, without being subjected to the exclusionary rule, the INS had developed its own "comprehensive scheme" for deterring Fourth Amendment violations by its officers in the specialized context in which immigration officers operate. *Id.* at 1044–45, 104 S.Ct. at 3486. Finally, the INS was subject to declaratory relief to remedy unconstitutional practices. *Id.* at 1045, 104 S.Ct. at 3486.

The *Lopez–Mendoza* Court concluded that the social costs in the context of deportation proceedings were "unusual and significant". 468 U.S. at 1046, 104 S.Ct. at 3487. If released, an alien's continued presence alone would be a violation of the criminal law. *Id.* The societal cost of application of the rule would be to "compel the courts to release from custody persons who would then resume their commission of a crime through their continuing, unlawful presence in the country." *Lopez–Mendoza*, 468 U.S. at 1050, 104 S.Ct. at 3489. The overwhelming number of deportations, perhaps one million per year, was also an important societal cost the Court weighed.

468 U.S. at 1048–49, 104 S.Ct. at 3488. Lastly, the Court noted the fact that INS often engages in mass arrests in confused and crowded situations. The majority predicted that officers would be unable to recollect the circumstances of an individual arrest so that a reviewing court could determine whether a Fourth Amendment violation had occurred. *Id.* at 1049–50, 104 S.Ct. at 3488–89.

In *Janis*, and in *Lopez–Mendoza*, there were sufficient deterrent pressures from alternative sources, but they are absent here. Because many juveniles subject to federal delinquency adjudications will not be eligible for prosecution in state or federal criminal proceedings,[7] there is not the already existing deterrent of exclusion of evidence from those proceedings. Moreover, the searches and seizures of juveniles are not so sufficiently different from those of ordinary criminal suspects that a law enforcement agency would develop a deterrence program on its own. In contrast, there is no evidence that law enforcement departments have developed any special procedures to deter illegal searches and seizures of juveniles. The existence of general departmental policies that endeavor to protect the Fourth Amendment rights of criminal suspects have never been found to be a reason to reject the application of the exclusionary rule.

Therefore, the sole deterrent for violation of the Fourth Amendment rights of juveniles is the existence of the exclusionary rule. The failure to adhere to the exclusionary rule in juvenile delinquency cases would reduce significantly the effectiveness of the rule's general deterrent powers. If the exclusionary rule is not enforced in juvenile delinquency proceedings to prevent Fourth Amendment violations, and an officer believes that the person he or she has stopped is a juvenile, the officer might feel less constrained to follow the Constitution. A holding that there is no practical remedy for the violation of the Fourth Amendment rights of suspects who will be processed by the federal juvenile delinquency system might be received by

---

7. *See* 18 U.S.C. § 5032 for relevant criteria.

some members of the law enforcement community as tantamount to a declaration that all restraints on police behavior towards juveniles had been removed.[8]

Furthermore, if the incidence of violations of the Fourth Amendment rights of juvenile suspects should increase, the government would be frustrated in cases where it has a strong interest in trying the juvenile as an adult. *See* 18 U.S.C. § 5032. In such cases, the government would be relegated to the juvenile system with its lesser punishments, if it could not convict the juvenile merely on the basis of the evidence lawfully obtained. Moreover, there likely would be cases where an officer violated the Fourth Amendment rights of a person who appeared to be a juvenile, believing there to be no sanction for such conduct, and it eventuated that the suspect was prosecutable only as an adult.[9] Such a person, although perhaps factually guilty of a serious offense, might have to be set free.

When prosecutorial officials contemplate what charges file against a juvenile, they must decide two things: whether to certify the case for federal disposition or allow state authorities to handle the matter; and whether to bring adult criminal charges or juvenile delinquency charges. "[I]t is not to be expected that the police will feel compelled to follow the constraints of the Fourth Amendment if they know that there is available an alternative to criminal prosecution which involves no sanction for police misconduct but which permits that imposition of substantial sanctions upon those processed." 1 Wayne R. LaFave, *Search and Seizure* § 1.7(b), at 150 (2d ed. 1987). In states that have determined that exclusion of illegally seized evidence from juvenile proceedings is required, officers know that they cannot violate the Constitution yet take advantage of the illegally seized evidence in federal court, state court, or state juvenile proceedings. To create a hole in the fabric of deterrence by allowing the admission of illegally seized evidence in federal juvenile delinquency adjudications would inevitably, at the margins, result in reduced deterrence of Fourth Amendment violations in all circumstances.

■ The *Lopez–Mendoza* majority concluded that the benefits of applying the exclusionary rule to deportation proceedings were minimized because the government's need for evidence is much less in those proceedings. 468 U.S. at 1043, 104 S.Ct. at 3485. The burden of proof in a juvenile delinquency hearing is always on the government, and is precisely the same as that in a criminal trial: beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970); *United States v. De Leon*, 768 F.2d 629, 631 (5th Cir.1985). Given the prosecution's need for evidence, the deterrent force of the exclusionary rule is high. Finally, institutional relief against a state law enforcement agency for unconstitutional practices is no more available to a juvenile than any other criminal suspect, in contrast to *Lopez–Mendoza*, 468 U.S. at 1045, 104 S.Ct. at 3486.

The costs of applying the rule to a delinquency adjudication are no more than in criminal proceedings:[10] an additional hear-

---

8. Compare the comments of Chief Justice Burger on the likely results of abandoning the exclusionary rule in *Bivens v. Six Unknown Narcotics Agents*, 403 U.S. 388, 421, 91 S.Ct. 1999, 2017, 29 L.Ed.2d 619 (Burger, C.J., dissenting): "[T]he public interest would be poorly served if law enforcement officials were suddenly to gain the impression, however erroneous, that all constitutional restraints on police had been removed—that an open season on 'criminals' had been declared."

9. A juvenile who has allegedly committed, after his sixteenth birthday, an act that, if committed by an adult, would constitute a crime that would involve an essential element of violence

or attempted violence, or a violation of the narcotics laws, must be tried as an adult, if he has been convicted previously of acts that would be such offenses. 18 U.S.C. § 5032.

10. The special costs that militated against applying the exclusionary rule to deportation proceedings are impertinent here. A juvenile's continued presence within United States borders is not *per se* illegal. Moreover, the number of deportation proceedings is enormous, while federal juvenile delinquency proceedings are relatively infrequent. The circumstances of most juvenile arrests are not standard, as in immigration raids, but vary as much as those of adults.

ing where the legality of the search and seizure of the evidence will be determined; the exclusion of probative evidence; and the possibility that "[t]he criminal is to go free because of the constable has blundered." *Elkins,* 364 U.S. at 216–17, 80 S.Ct. at 1443–44 (quoting *People v. Defore,* 242 N.Y. 13, 150 N.E. 585, 587, *cert. denied,* 270 U.S. 657, 46 S.Ct. 353, 70 L.Ed. 784 (1926)). In the usual circumstance, because the suppression hearing will be a separate proceeding, the conduct of the juvenile delinquency adjudication itself will be unaffected. *Compare McKeiver v. Pennsylvania,* 403 U.S. 528, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971) (jury trial would destroy unique nature of the juvenile delinquency hearing proceeding) *with R.W.T. v. Dalton,* 712 F.2d 1225, 1230 (8th Cir.) (probable cause hearing will not impinge on functioning of juvenile process), *cert. denied,* 464 U.S. 1009, 104 S.Ct. 527, 78 L.Ed.2d 710 (1983). For all these reasons, it is concluded that the exclusionary rule applies to federal delinquency adjudications.

III. *Defendant's Standing to Raise a Fourth Amendment Violation*

██ Defendant has not challenged the legality of the stop of his vehicle. The government argues that Doe lacks standing to raise the issue of any Fourth Amendment violation arising from the search of the automobile he was driving. In order to have Fourth Amendment standing, a defendant must show 1) an actual, subjective expectation of privacy with respect to the place being searched or items being seized, and 2) that the expectation is one that society would recognize as reasonable. *United States v. Lee,* 898 F.2d 1034, 1037–38 (5th Cir.1990) (citing *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978)). A defendant must prove the above elements by a preponderance of the evidence to establish standing. *See, e.g., United States v. Pierce,* 959 F.2d 1297, 1303 (5th Cir.1992).

██ A person's status as operator of an automobile does not *per se* confer Fourth Amendment standing. *United*

*States v. Lanford,* 838 F.2d 1351, 1353 (5th Cir.1988) (operator of a stolen car lacks standing). However, where a person has borrowed an automobile from another, with another's consent, the borrower becomes a lawful possessor of the vehicle and thus has standing to challenge its search. *Lee,* 898 F.2d at 1038 (citing *United States v. Martinez,* 808 F.2d 1050, 1056 (5th Cir.), *cert. denied,* 481 U.S. 1032, 107 S.Ct. 1962, 95 L.Ed.2d 533 (1987)); *United States v. Pena,* 961 F.2d 333, 337 (2d Cir.1992). "[A] defendant is not required 'to produce legal documentation showing a chain of lawful custody from the registered owner' to himself." *United States v. Rubio–Rivera,* 917 F.2d 1271, 1275 (10th Cir.1990) (quoting *United States v. Arango,* 912 F.2d 441, 446 n. 2 (10th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1318, 113 L.Ed.2d 251 (1991)). A defendant must show possession was gained from the owner or from someone with the authority to grant permission. *Id.*

The government rests its contention that defendant lacks standing on the fact that defendant did not own the Camaro he was operating on March 30, 1991. The government thereby implies that the first *Rakas* prong is not met here. Officer Crow testified that papers in the vehicle defendant was driving showed that it was registered to Shannon Blalock and had been purchased from Robert Greenlee. However, Roderick Kellum, one of the passengers in defendant's vehicle, testified as a witness for the prosecution that the car was "Frederick's". He also testified to the effect that the vehicle was present at defendant's house when they left for Houston. Kellum's statement that the car was "Frederick's" must be given a common sense interpretation, rather than a technical legal meaning as to where title rested. Kellum's testimony will be construed as signifying that the defendant routinely drove the car with the permission of the owner. As a friend of the defendant, Kellum would be in position to know whether Doe was driving the Camaro with authorization. Based on the testimony adduced at trial, it is found that defendant was driving the Camaro with the permission of someone who

had the authority to grant him leave to operate the vehicle.

This situation is far removed from that in *United States v. Parks,* 684 F.2d 1078 (5th Cir.1982), where the United States Court of Appeals for the Fifth Circuit denied standing to a defendant who had piloted a plane in which the government illegally had planted an electronic beeper. Testimony from several sources stated or implied that the plane had been stolen. *Id.* at 1081–82. While the district court declined to make a factual finding as to whether the plane had been stolen, it concluded that the pilot lacked standing, since the only indicia of an expectation of privacy was the defendant's possession of the plane's key by unexplained means. *Id.* at 1082–84. The appellate court affirmed noting, *inter alia,* that there was no evidence establishing the pilot's possession of the plane as legitimate. *Id.*

By contrast, in the case at bar, there was testimony by a government witness from which it is reasonable to infer that defendant's possession of the vehicle was lawful and with permission. Here, the government has not contended that the car was stolen, nor has it produced an iota of evidence that defendant lacked permission to drive the car. While the burden is on the defendant to show his possession was lawful, the evidentiary demonstration required to discharge this burden will be less when there is no evidence showing unlawful possession. *Compare United States v. Miller,* 821 F.2d 546, 548–49 (11th Cir.1987) (where government produces no evidence establishing operation is without permission of owner, defendant's assertion that he borrowed car from an unidentified friend sufficient to establish standing), *with Parks,* 684 F.2d at 1084–85 (where defendants refused to testify as to person from whom permission to use apparently stolen plane was obtained, to avoid reprisal and maintain code of "honor among thieves", they failed to carry burden of demonstrating standing).

It is concluded that defendant has shown by a preponderance of the evidence that he possessed a reasonable expectation of privacy in the car, and that he has standing under the Fourth Amendment to complain of any search and seizure violations concerning it.

## IV. *The Legality of the Search Carried Out on March 30, 1991*

■ The Fourth Amendment protects individuals from unreasonable searches and seizures, and warrantless searches are presumptively unreasonable. *United States v. Villarreal,* 963 F.2d 770 (5th Cir.1992). It is well established that the burdens of production and persuasion generally rest upon the movant in a suppression hearing. *United States v. De La Fuente,* 548 F.2d 528, 533 (5th Cir.), *cert. denied,* 431 U.S. 932, 97 S.Ct. 2640, 53 L.Ed.2d 249 (1977), *and cert. denied,* 434 U.S. 954, 98 S.Ct. 479, 54 L.Ed.2d 312 (1977). However, in some very well defined situations, the ultimate burden of persuasion may shift to the government. *Id.* If, for example, a defendant produces evidence that he was searched and evidence seized without a warrant, the burden shifts to the government to justify the warrantless search and seizure. *Id.; Pena,* 961 F.2d 338–39. Here, the burden has shifted to the government, because it is uncontested the search of defendant's car was carried out without a warrant.[11]

### A. Eyewitness Testimony

Officer Crow and Roderick Kellum, the two government witnesses to testify at defendant's juvenile delinquency hearing about the events of March 30, 1991, gave accounts that overlapped to a degree, but conflicted in several noteworthy respects. The officer testified that as he drove his vehicle into the convenience stop parking lot, he saw all three occupants leave the defendant's car. Crow first approached Roderick Kellum as the latter was urinat-

11. While the government's post trial brief could be interpreted as abandoning its consent and probable cause justifications, they will be addressed because of the high threshold required to find waiver of an argument by the government. *See United States v. Kelly,* 961 F.2d 524, 526–28, 527 n. 4 (5th Cir.1992).

ing at the corner of the building. The officer asked for identification, and Kellum's birth-date, both of which were provided. The officer recalled he smelled alcohol on Kellum's breath, and because Kellum was under twenty-one, Crow suspected illegal alcohol consumption by a minor.[12] The officer next made a radio call to a dispatcher at the Cherokee County Sheriff's Office to determine whether there were any outstanding warrants for Kellum's arrest. Crow then approached the other two persons had occupied the vehicle, and again asked for identification, so that a "warrant check" regarding them could be performed.

Crow testified that immediately after calling the dispatcher, he returned to the Camaro, and asked the defendant if he could search the car. According to Crow, Doe said he "didn't care," but then retorted: "Don't you need a search warrant?" The officer recalled that he replied he did not, because "they were all juveniles and that there was an odor of alcohol", and then told them that he was going to search the car for alcohol. The officer next informed the three vehicle occupants that they would be required to sit in the rear of his patrol car while he searched their car, explaining that it was necessary for their safety and his. The officer maintained that two of the suspects, defendant and Kellum, ran away from the vehicle at this point. The third suspect, Kelvin Williams, did not. Williams, who did not have a driver's license, was placed in back of the patrol car.

The officer testified that, because he considered the car to have been abandoned, he then performed an impounded vehicle inventory search. After finding nothing "that merited inventory" inside the passenger compartment of the car, Crow took the keys from the ignition and opened the hatchback. There he discovered a closed, translucent, white, plastic bag in the rear of the compartment, along with coats and clothing. He opened the plastic bag and found within it an opaque, gold-green, bank bag; a loaded .38 caliber revolver; and

black pepper. The officer at that time opened the bank bag to see if there were any money cached within. Inside the bank bag the officer found another plastic bag, which he thereupon opened. Within that plastic bag were circular disks of cocaine. A box of ammunition was found inside the passenger compartment. Eventually, defendant and Kellum were apprehended.

Except in the following respects, Kellum's testimony was consistent with Crow's. Kellum testified that as he was urinating, Officers Crow and Nolan approached him, and Crow asked Kellum what he was doing with the defendant, whom Crow apparently knew on sight and by name. Kellum also gave a very different account of the search. According to Kellum, when Crow asked Doe for permission to search, the latter refused outright. Kellum remembered that, nevertheless, the officer said he would search. Crow first found the gun in the trunk and showed it to the occupants. Kellum recalled that defendant at that point told him there were drugs in the car, and that they should run. Kellum immediately did so. Kellum denied that any of the vehicle occupants had consumed alcohol. He also stated that Officer Crow did not ask them to sit in the back of his patrol car.

**B. There Was No Valid Consent Search of the Vehicle**

■■ A search authorized by consent is wholly valid. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222, 93 S.Ct. 2041, 2045, 36 L.Ed.2d 854 (1972). The state must show that the defendant consented to the search and that such consent was, in fact, freely and voluntarily given, based on the totality of the circumstances. *Id.* at 227, 93 S.Ct. at 2048; *Florida v. Royer*, 460 U.S. 491, 497, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983) (plurality opinion). The burden is on the prosecution to so prove by a preponderance of the evidence. *Bumper v. North Carolina*, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968); *Villarreal*,

---

**12.** Texas law prohibits the consumption of alcohol by a minor unless the consumption occurred in the visible presence of an adult parent, spouse, or guardian, Tex. Alco. Bev.Code. Ann. § 106.04 (West 1978 & Supp.1992).

963 F.2d 770 (citing *United States v. Hurtado*, 905 F.2d 74, 76 (5th Cir.1990)). The standard for interpreting consent under the Fourth Amendment is objective reasonableness. *Florida v. Jimeno*, —— U.S. ——, ———–——, 111 S.Ct. 1801, 1803–04, 114 L.Ed.2d 297 (1991).

■ In this case, the issue of voluntariness need not be reached, because it is quite clear that a reasonable person would not construe anything that occurred on March 30, 1991, as consent. Kellum's testimony was definitive that defendant had refused consent to the search. Crow testified inconsistently on this issue. At one point, in response to a question by the court, he stated that he did not interpret defendant's statements as consent to the search. Later, on cross-examination, he insisted that defendant had given him permission to search but had not consented. While the officer's confusing testimony casts some doubt on his account of the salient events, it is not Crow's subjective perception of consent but objective reasonableness that is the test for consent under *Jimeno*.

Assuming, *arguendo*, that Doe uttered the words attributed to him by Officer Crow, defendant's statement that he did not care if Crow searched cannot be considered consent, since defendant immediately thereafter stated his belief, incorrect though it may have been, that the officer needed a warrant to search his car. At best, Doe's statement indicated mere submission to the officer's authority, which would not qualify as consent. *Royer*, 460 U.S. at 497, 103 S.Ct. at 1324 (plurality opinion). Under the circumstances, and given defendant's limited understanding of the intricacies of Fourth Amendment law, it is most reasonable to construe defendant's statements as protests to the impending search based on his belief the search would be unlawful.

### C. There Was No Probable Cause to Search the Vehicle

■ An evidentiary search of an automobile generally must be based on probable cause, although no warrant is required.

*United States v. Ross*, 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982); *United States v. Kelly*, 961 F.2d at 527. While probable cause is a difficult standard to articulate, the United States Court of Appeals for the Fifth Circuit has reiterated that "probable cause does not require proof beyond a reasonable doubt; 'only the probability, and not a prima facie showing, of criminal activity is that standard for probable cause.'" *United States v. Brown*, 941 F.2d 1300, 1302 (5th Cir.) (per curiam) (quoting *Spinelli v. United States*, 393 U.S. 410, 419, 89 S.Ct. 584, 590, 21 L.Ed.2d 637 (1969)), *cert. denied*, —— U.S. ——, 112 S.Ct. 648, 116 L.Ed.2d 665 (1991). Probable cause must be based on the totality of the circumstances. *Kelly*, 961 F.2d at 527. However, the factors relevant to probable cause are not technical ones, but the factual and practical realities of everyday life on which reasonable and prudent persons, not legal technicians, act. *Id.* If officers have probable cause to believe a car contains contraband, then they have the right to search all of the car, including the locked trunk and engine compartment, and any container within it that could conceal the object of search. *Kelly*, 961 F.2d at 528. *See also California v. Acevedo*, —— U.S. ——, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1991).

■ Here, the government argued that Crow's smelling of alcohol on the breaths of all three automobile occupants justified the subsequent search of the car. However, Crow's testimony that he smelled alcohol on the breaths of the defendants was not credible. The presence of alcohol was specifically denied by Kellum, who at this point has no motive to deny that he had consumed alcohol on March 30, 1991. More importantly, the officer admitted on cross-examination that his own incident report fails to mention the presence of the smell of alcohol or that he searched to locate it in the vehicle. If, as the officer testified at trial, he searched defendant's vehicle to look for alcohol, it is difficult to believe that his report would not reflect this. Officer Crow testified at trial that he suspected defendant was driving while intoxicated.

Again, the officer admitted no mention of this suspicion is anywhere in the contemporaneously prepared incident report. Given that no credible evidence exists that defendant or his passenger had violated Texas alcoholic beverage control laws, it is concluded that there was no probable cause for the vehicle search.

### D. No Valid On–The–Scene Inventory Search Occurred

■ A valid inventory of an impounded automobile is an exception to the requirement that the police may conduct searches only in accordance with a valid warrant. *Colorado v. Bertine,* 479 U.S. 367, 371, 107 S.Ct. 738, 741, 93 L.Ed.2d 739 (1987); *South Dakota v. Opperman,* 428 U.S. 364, 367–68, 96 S.Ct. 3092, 3096, 49 L.Ed.2d 1000 (1976); *United States v. Skillern,* 947 F.2d 1268, 1275 (5th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1509, 117 L.Ed.2d 646 (1992). If an inventory is part of a bona fide "routine administrative caretaking function" of the police, and not a pretext to disguise an impermissible search for evidence, probable cause is not required. *Skillern,* 947 F.2d at 1275 (citations omitted). The Fourth Amendment only requires that such a good faith inventory be consistent with reasonable, standardized police procedures. *Id.*

■ The government maintains that Officer Crow discovered the evidence sought to be used against defendant in the course of a valid inventory search conducted after defendant, the only licensed driver for the car, fled the scene and abandoned the vehicle. Kellum stated that Crow searched the car while he and defendant were present. The government argues that the court need not resolve this credibility issue between Kellum and Crow, but this contention is incorrect. If Crow's version of events is true, then the search that was conducted at the scene was arguably a lawful inventory search executed on an abandoned vehicle. If Kellum's version is veracious, then the search occurred before the vehicle was abandoned and, therefore, could not qualify as an valid inventory search. It is found that Kellum's testimo-

ny was much more credible on this score. First, Kellum's story is simply a more plausible version of events. Second, the demeanor evidence at the hearing weighed in Kellum's favor. Third, Kellum, against whom the government has dropped all charges, in exchange for his grand jury testimony against the defendant, has no motive to fabricate his version of events.

On the other hand, Officer Crow has the incentive to testify to a version of events that comports with the Fourth Amendment. Moreover, the officer's testimony as to the inventory search he supposedly performed was inconsistent. On direct examination, Crow stated that after the defendant and Kellum fled, he secured an inventory sheet and began to fill it out, in accordance with department procedure. However, on cross-examination, the Officer stated that the only written document he prepared in connection with the events of March 30, 1991, was his officer's report. No inventory list was produced at the hearing. Given this and other inconsistencies in the officer's account of events, it is found that Officer Crow illegally searched the car, and that he found the gun while defendant and his passengers were present, and not during a later inventory procedure.

■■ Evidence that is a fruit of an illegal search, both tangible and testimonial, must be excluded up to the point at which the connection with the unlawful search becomes "so attenuated as to dissipate the taint." *Wong Sun v. United States,* 371 U.S. 471, 487, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963) (quoting *Nardone v. United States,* 308 U.S. 338, 341, 60 S.Ct. 266, 268, 84 L.Ed. 307 (1939)). A suspect's voluntary abandonment of evidence can remove the taint of an illegal stop or arrest. *United States v. Beck,* 602 F.2d 726, 729 (5th Cir.1979) (citing *United States v. Colbert,* 474 F.2d 174, 176 (5th Cir.1973) (en banc) (a person has no reasonable expectation of privacy in abandoned property)). However, the abandonment must be truly voluntary to remove the taint of police misconduct. *See United States v. Roman,* 849 F.2d 920, 922–23 (5th Cir.1988); *Beck,* 602 F.2d at 729–30. In other words, the defen-

dant's decision to abandon the property cannot itself be the result of the illegal police activity.

In *Beck*, the leading Fifth Circuit case in this area, the police illegally stopped an automobile. After the stop was made, the vehicle occupants threw a marijuana cigarette, and a bag containing marijuana and a syringe from the car window. 602 F.2d at 730. The court held that the "acts of abandonment d[id] not reflect the mere coincidental decision of Beck and his passenger to discard their narcotics; it would be sheer fiction to presume they were caused by anything other than the illegal stop." *Id.* The tribunal reasoned that, because there was a nexus between the lawless police conduct and the discovery of the challenged evidence which had not become attenuated, the discarded evidence should be suppressed. *Id.*

 Here, Officer Crow discovered the gun by illegally searching the car and the translucent, white, plastic bag in the trunk. Defendant fled at that time, knowing the officer was about to come upon the cocaine stored inside the same plastic bag. Apparently, Officer Crow then continued his search of the vehicle and found the cocaine. There is language in the government's brief which may be interpreted as an attempt to justify the search conducted after defendant's flight as the lawful inventory search of an abandoned vehicle. However, the defendant "abandoned" his vehicle because Officer Crow was engaged in an illegal search of the automobile, and was about to discover a large amount of cocaine concealed within it. If defendant had not run, and the officer had continued his search and found the drugs, there is no question that they would be a fruit of an unlawful search. Defendant's flight, under the circumstances, does not remove the taint of the illegal search. The government has offered no basis to distinguish *Beck*. Consequently, no valid inventory search of an abandoned vehicle occurred in this case.

**V. The Evidence Cannot be Admitted Via "Inevitable Discovery"**

**A. Applicable Law and the Government's Argument**

There are several well-recognized exceptions to the exclusionary rule that allow for the admission of evidence seized after but not as the fruit of an illegal search. In its post-trial brief, the government makes a two-paragraph argument that even if the illegality of the search that took place on March 30, 1991, is acknowledged, the evidence to be used against the defendant is nonetheless admissible under the inevitable discovery doctrine. Defendant did not respond to this contention. Little evidence relating to this issue was adduced at the hearing. Analysis of the government's contention is problematic.[13]

The doctrine of inevitable discovery was first articulated by the Supreme Court in *Nix v. Williams*, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984), and briefly discussed in *Murray v. United States*, 487 U.S. 533, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988). Because the core rationale of the exclusionary rule is to deter police misconduct, the prosecution must not be put in a better position as a result of police illegality. *Nix v. Williams*, 467 U.S. at 442–43, 104 S.Ct. at 2508. The inevitable discovery doctrine is designed to ensure that the prosecution is not put in a *worse* position simply because of police misconduct. *Id.* at 443, 104 S.Ct. at 2508 (emphasis in original).

 For the "inevitable discovery" exception to the exclusionary rule to apply, the government must prove by a preponderance of the evidence (1) that there was a reasonable probability that the evidence would have been discovered by lawful means in the absence of police misconduct, and (2) that the government was actively pursuing a substantial alternative line of investigation at the time of the constitu-

---

**13.** Research has revealed only a handful of cases to have considered an "inevitable inventory search" argument. *United States v. Yanes*, 671 F.Supp. 927 (D.Conn.1987), *aff'd in part and* *rev'd in part sub nom. United States v. Gorski*, 852 F.2d 692 (2d Cir.1988); *United States v. Ibarra*, 725 F.Supp. 1195 (D.Wyo.1989), *aff'd 955* F.2d 1405 (10th Cir.1992).

tional violation. *United States v. Lamas*, 930 F.2d 1099, 1102 (5th Cir.1991) (citing *United States v. Cherry*, 759 F.2d 1196, 1205–06 (5th Cir.1985), *cert. denied*, 479 U.S. 1056, 107 S.Ct. 932, 93 L.Ed.2d 983 (1987)). The inevitable discovery exception involves no speculative elements but, instead, focuses on demonstrated historical facts capable of ready verification or impeachment. *Nix v. Williams*, 467 U.S. at 445 n. 5, 104 S.Ct. at 2509 n. 5.

All inevitable discovery arguments are counter-factual and are often made when the government is "clinging to the last straw". *United States v. Amuny*, 767 F.2d 1113, 1129 n. 10 (5th Cir.1985). The government asks a court to hypothesize a situation where the police-citizen encounter comported with the Constitution. The argument justifying application of the doctrine here is as follows: 1. Officer Crow had called in a warrant check on defendant to the Cherokee County Sheriff's dispatcher; 2. Defendant had outstanding juvenile warrants in Smith County, Texas; 3. Officer Crow would have lawfully arrested defendant on those warrants during the traffic stop had he not fled the scene; 4. Officer Crow would have lawfully impounded defendant's vehicle after arresting him; 5. Officer Crow would have performed a lawful inventory search procedure on the vehicle, which would have revealed the gun and cocaine. Only the first two steps in this analysis are historical facts, and neither is questioned by the defendant. However, as elaborated below, the government has failed to prove at least two of the remaining propositions.[14]

B. The Government Failed to Prove Defendant Would Have Been Arrested in a Lawful Manner

■■■ Officer Crow had stopped defendant for rolling through a stop sign. A stop based upon the violation of a traffic law for which custodial arrest is not permitted is analogous to the stops authorized by *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). *Berkermer v. McCarty*, 468 U.S. 420, 436–440, 104 S.Ct. 3138, 3148–50, 82 L.Ed.2d 317 (1984). Such a stop need be supported only by an officer's reasonable, articulable suspicion that the suspect is engaged in illegal activity. *United States v. Brignoni–Ponce*, 422 U.S. 873, 881, 95 S.Ct. 2574, 2580, 45 L.Ed.2d 607 (1975).[15] A traffic stop not only must be justified by reasonable suspicion at the inception of the intrusion, it must be reasonably related in scope to the circumstances justifying the intrusion in the first instance. *United States v. Lee*, 898 F.2d 1034, 1039 (5th Cir.1990) (citing *Terry*). The government must prove that both conditions are satisfied. *Royer*, 460 U.S. at 500, 103 S.Ct. at 1325 (plurality opinion).

■■■ A routine traffic stop is subject to significant limitations:

> [D]etention of a motorist is presumptively brief. The vast majority of roadside detentions last only a few minutes. A motorist's expectations, when he sees a policeman's light flashing behind him, are that he will be obliged to spend a short time answering questions and waiting while the officer checks his license and registration, that he may then be given a citation, but in the end he most likely will be allowed to continue on his way.

*Berkermer v. McCarty*, 468 U.S. at 437, 104 S.Ct. at 3149. An investigative detention may last no longer than is necessary to effectuate the purposes of the stop. *Royer*, 460 U.S. at 500, 103 S.Ct. at 1325 (plurality opinion); *United States v. Holloway*, 962 F.2d 451, 454 n. 2 (5th Cir.1992); *United States v. Zukas*, 843 F.2d 179, 182 (5th Cir.1988), *cert. denied*, 490 U.S. 1019, 109 S.Ct. 1742, 104 L.Ed.2d 179 (1989).

■■■ When conducting a routine traffic stop, an officer may ask for a driver's license and vehicle registration, run a computer check through the National Crime Information Center (NCIC), and issue a

---

**14.** Specifically, numbers three and five. Proposition number four need not be addressed in light of the failure of proof on the other propositions.

**15.** The government has not contended that Texas traffic law permits a custodial arrest for rolling through a stop sign.

citation. *United States v. Walker*, 933 F.2d 812, 816 (10th Cir.1991) (citing *United States v. Guzman*, 864 F.2d 1512, 1518 (10th Cir.1988)), *cert. denied,* — U.S. ——, 112 S.Ct. 1168, 117 L.Ed.2d 414 (1992). Once an officer confirms that a vehicle is not stolen and that the operator has a valid license, the officer's authority is limited to the issuance of a citation or warning. *Id.* The rationale for allowing a computer check for warrants during traffic stops is that it may determine the existence of outstanding warrants without delaying a motorist any longer than the traffic stop otherwise would. *United States v. Gonzalez,* 763 F.2d 1127, 1130 (10th Cir.1985); *United States v. Recalde,* 761 F.2d 1448, 1455 (10th Cir.1985).

Only when there is reasonable articulable suspicion of criminal activity may a traffic stop be especially lengthened to check a motorist for warrants. *See United States v. Corral,* 823 F.2d 1389, 1393 (10th Cir.1987) (routine roadblock allowed for checking license, registration, and proof of insurance but did not include warrants check; asking motorist to park on shoulder to perform warrants check justified by reasonable articulable suspicion), *cert. denied,* 486 U.S. 1054, 108 S.Ct. 2820, 100 L.Ed.2d 921 (1988). *See also United States v. Rutherford,* 824 F.2d 831, 833 (10th Cir. 1987) (twenty-five minute delay to wait for computer check of car registration justified where reasonable suspicion existed that driver was trafficking drugs and suspect had fled from officer).

There is no authority that permits an officer to hold a person, stopped for no other reason that a minor traffic violation, for an extended period of time in order to investigate whether an arrest warrant has been issued for the motorist without reasonable articulable suspicion that the person is wanted for any past crime. *See United States v. Hensley,* 469 U.S. 221, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985). In *Hensley,* the Supreme Court was confronted with a situation where a person had been detained while officers ran a check for warrants from another jurisdiction. The Supreme Court determined that the detention

was proper under *Terry v. Ohio,* because the person had originally been stopped for reasonable suspicion of criminal activity and then briefly detained so that the reasonable suspicion could be confirmed or dispelled. 469 U.S. at 234–36, 105 S.Ct. at 683–84; *Id.* at 236–37, 105 S.Ct. at 684 (Brennan, J., concurring) (stop "lasted a mere matter of moments").

However, the Court stated explicitly that it was not suggesting that a police department could detain a suspect just to confirm the existence of a warrant in another department. 469 U.S. at 235, 105 S.Ct. at 683. "Given the distance involved and the time required to identify and communicate with the [other] department ... such a detention might well be so lengthy or intrusive as to exceed the permissible limits of a *Terry* stop." *Id.* In determining whether a violation of *Terry* occurs in such a situation, a court should balance the nature and quality of the intrusion of personal security against the importance of the government interests alleged to justify the intrusion. 469 U.S. at 228, 105 S.Ct. at 680. As a general proposition, the Court noted that the government's interests to be balanced in a situation where the detention is based on reasonable suspicion of past criminal activity are somewhat less than in one where ongoing criminal activity is suspected. *Id.* at 228–29, 105 S.Ct. at 680. Despite this lower governmental interest, the Court concluded that stops based upon reasonable articulable suspicion that a motorist is responsible for a completed felony should be judged according to under *Terry* principles. The Court to declined extend the rule in *Hensley* beyond serious felonies. *Id.*

As the Supreme Court and lower courts have often articulated, the time limitations of a *Terry* stop depend on the facts of a given situation, including the level of an officer's suspicions and the actions of both the officer and suspects. They are not subject to a bright line time-limit. *United States v. Sharpe,* 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985). In *Sharpe,* the Court upheld a *Terry* detention of twenty minutes where the suspect was

driving a heavily loaded camper, with covered windows, over the speed limit, and had responded to the stop signal of a police officer driving a patrol car with its lights flashing by proceeding down the highway in a reckless manner. *Id.* at 676–77, 105 S.Ct. at 1570. These factors provided some reasonable indication that criminal activity was afoot. Crucially, much of the twenty minute delay in *Sharpe* was caused by the actions of the suspects themselves. *Id.* at 687–88, 105 S.Ct. at 1576.

A traffic stop cannot become a convenient occasion for an officer to delay the travels of an ordinary motorist so that the officer may dispel a mere hunch that the motorist has committed a past crime or present crime. *See United States v. Walker,* 941 F.2d 1086, 1088–90 (10th Cir.1991) (order denying rehearing) (government interest in interdicting narcotics does not allow for delaying motorist for questioning where no reasonable articulable suspicion of drug-trafficking exists), *cert. denied,* — U.S. —, 112 S.Ct. 1168, 117 L.Ed.2d 414 (1992). The reasoning of *Walker* applies *a fortiori* to a delay caused by a warrant check because, as the Supreme Court has recognized, the government's interests in discovering past crime are not as significant as those in ferreting out on-going violations. *Hensley,* 469 U.S. at 228, 105 S.Ct. at 680. Thus, the individual's interests in going about his business are greater.

In contrast to *Hensley,* there were absolutely no circumstances here that would have justified a belief that criminal activity was afoot, nor were there any indications that defendant or his companions had engaged in any past criminal activity. Officer Crow had stopped three African-American youths who were returning to Tyler from a trip in a borrowed car to Houston along a route customarily taken for such a journey. Defendant, the operator of the vehicle, possessed a valid Texas driver's license. While defendant did not own the vehicle he was operating, the officer did not testify that he found that to be suspicious in and of itself, and he did not testify that he had thought the vehicle had been stolen. The other vehicle occupants cooperated and identified themselves to the officer when requested to do so. The only basis for defendant's detention here was a traffic stop for a minor moving violation; and under these circumstances, the reasonable bounds of the traffic stop should have been quite narrow. *Cf. Lee,* 898 F.2d at 1040 (with each additional fact learned or observed by the trooper, the suspicious nature of the defendants' activity grew stronger and the trooper reasonably and gradually escalated the nature of the intrusion in proportionate response to the level of suspicious activity; therefore, continued detention was proper).

Officer Crow would not have been privileged to extend the defendant's detention significantly beyond that routinely required for a traffic stop, in order that he could receive a warrant report, unless he had reasonable suspicion of criminal activity that a warrant check might have confirmed or dispelled. *See United States v. Luckett,* 484 F.2d 89, 91 (9th Cir.1973) (improper under *Terry* to hold a jay-walker for warrant check). Therefore, any extended delay of defendant's travels would not have been reasonably related to the circumstances of the minor moving violation that allowed for the original intrusion, nor justified by any suspicious circumstances that had developed during the stop. *Terry,* 392 U.S. at 20, 88 S.Ct. at 1879. If it had been necessary for Officer Crow to have held defendant for an extended period of time, *i.e.,* considerably longer than that required by the routine traffic stop itself, so as to wait for the juvenile warrant report from the dispatcher, such detention would have been beyond what *Terry* would allow, and would have been unlawful under the Fourth Amendment.[16]

---

**16.** A *de minimis* additional delay of a minute or two may be reasonable, *see Pennsylvania v. Mimms,* 434 U.S. 106, 111, 98 S.Ct. 330, 333, 54 L.Ed.2d 331 (1977) (per curiam) (requiring person detained for traffic violation to leave her car *de minimis* additional intrusion), while longer delays might not be reasonable under a given set of circumstances.

At the April 27, 1992, juvenile delinquency hearing Officer Crow was asked, on redirect examination, if he had received a response from Cherokee County dispatch regarding the warrant check "at any time on th[e] evening [of March 30, 1991.]" He replied in the affirmative: "They came back and advised me [the defendant] had juvenile warrants out." On re-cross examination, the following transpired:

Q: Officer, you talked about receiving a teletype back from or a dispatch back from your dispatcher regarding some juvenile warrants?

A: I believe Cherokee County did it.

Q: Cherokee County? That was sometime later was it not?

THE COURT: What was sometime later?

LAWYER: The dispatch from Cherokee County?

A: I wouldn't recall the exact amount of time. Typically it takes anywhere from two to three to four minutes.

Q: But you don't know when that particular dispatch was received?

A: No, sir, I do not.

In his direct testimony, Officer Crow stated he had called in for the warrant check on all three vehicle occupants at the beginning of the traffic stop. In his account of the activities which transpired at the scene, Crow did not state he received a warrant report regarding the defendant. Defendant had been stopped at approximately 9:30 p.m. The evidence discloses only that the report of juvenile warrants regarding the defendant came back some time that evening. There is no evidence in the record indicating whether the warrants report came back in three minutes, thirty minutes, or two hours and thirty minutes after the traffic stop began.[17] Given the inconsistencies in other aspects of Officer Crow's testimony, it will not be assumed the warrant report came back within a few minutes of the original stop.

The government has not proved when the warrants report came back on the night of March 30, 1991. Consequently, there is no evidence in the record upon which to base a factual finding that the juvenile warrant information would have been available to the officer, or the dispatcher,[18] during the time within which Crow could have lawfully held the defendant for the traffic violation. A court entertaining an inevitable discovery argument cannot merely speculate that a lawful stop would have been preformed. The inevitable discovery exception involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment. *Nix v. Williams*, 467 U.S. at 445 n. 5, 104 S.Ct. at 2509 n. 5. Perhaps, evidence exists that would fix the time the warrant report came back, but it has not been produced. Therefore, it is found that the government has not proved that defendant probably would have been arrested on the evening of March 30, 1991, had Officer Crow not obtained the evidence sought to be introduced here in an unlawful manner.

The possibility that Officer Crow might have held the defendant in violation of Fourth Amendment until probable cause to arrest developed does not alter the preceding conclusion. First, a court should not presume that a law enforcement officer will act unlawfully. Even given the violations of the Fourth Amendment that Officer Crow did commit

---

17. The evidence does not establish whether the warrant check the Cherokee County Sheriff dispatcher was performing was a computerized one such as the NCIC. Even if it is the case that the county routinely uses a rapid, computerized system, there is no evidence that the system was operational, and not "down", at the time defendant was stopped on the evening of March 30, 1991.

18. The "collective knowledge" does not apply here. "Probable cause can rest upon the collective knowledge of the police, rather than solely on that of the officer who actually makes the arrest, when there is 'some degree of communication between the two.'" *United States v. Lee* (*Lee* II), 962 F.2d 430, 435–36 (5th Cir.1992). The issue here is not whether the police had probable cause to arrest defendant, but whether the facts constituting probable cause inevitably would have been known to Crow or his dispatcher during a traffic stop of reasonable length.

on March 30, 1991, it was neither inevitable nor reasonably probable that Officer Crow would have held defendant for an extended period of time, in violation of the Fourth Amendment, until probable cause to arrest, in the form of outstanding warrants, materialized. The inevitable discovery doctrine also requires that the discovery of the evidence would have been accomplished by *lawful* means, if not for the officer misconduct. *Lamas,* 930 F.2d at 1102. The inevitable discovery doctrine is unavailable to the government here, since it has not shown the likelihood that Officer Crow would have obtained, in a lawful fashion, independent probable cause to arrest defendant during the traffic stop.

The exclusionary rule doctrine articulated in *United v. Walker,* 535 F.2d 896, 899 (5th Cir.), *cert. denied,* 429 U.S. 982, 97 S.Ct. 498, 50 L.Ed.2d 592 (1976), and *United States v. Clark,* 891 F.2d 501, 505–06 (4th Cir.1989) (per curiam), and explored by this court in *United States v. Thomas,* 787 F.Supp. 663, 665–66 (E.D.Tex.1992), does not apply to the situation at bar. Those cases recognize that where the only connection between an illegal arrest and a subsequent lawful arrest is the continuing presence of the defendant, the second arrest is not a fruit of the first arrest under *Wong Sun.*

██ As the Supreme Court has stated: "The question whether evidence should be excluded from a criminal proceeding involves two discrete inquiries: whether the evidence was seized in violation of the Fourth Amendment, and whether the exclusionary rule is the appropriate remedy for the violation." *New Jersey v. T.L.O.,* 469 U.S. 325, 333 n. 3, 105 S.Ct. 733, 738 n. 3, 83 L.Ed.2d 720 (1985). *Walker* and *Clark* deal with the second question. The issue here is the first. Under the inevitable discovery inquiry, the focus is on the *lawfulness of the means* by which incriminating the evidence would have been obtained, were it not for the Fourth Amendment violation that did occur. That incriminating evidence obtained "because of" but not as "a fruit of" an additional illegality might not itself be excluded under the

*Walker* doctrine is immaterial to the application of inevitable discovery exception. Where the government has failed to show that the defendant probably would have been arrested without the occurrence of an additional Fourth Amendment violation, it cannot take advantage of the inevitable discovery doctrine.

C. The Government Failed to Prove That the Evidence Against Defendant Would Have Been Seized in a Lawful Manner

██ An inventory search cannot be a "ruse for a general rummaging in order to discover incriminating evidence." *Florida v. Wells,* 495 U.S. 1, 110 S.Ct. 1632, 109 L.Ed.2d 1 (1990); *United v. Walker,* 931 F.2d 1066, 1068 (5th Cir.1991). The Supreme Court's decisions have always adhered to the requirement that inventories be conducted according to explicit standardized procedures, so as to limit officer discretion. *Walker,* 931 F.2d at 1068. This is one of the most important factors making inventory searches reasonable. *United States v. Hahn,* 922 F.2d 243, 246 (5th Cir.1991). Moreover, standardized criteria or an established routine regarding the opening of closed containers during inventory searches must already exist. *Wells,* 495 U.S. at 4, 110 S.Ct. at 1636; *United States v. Gallo,* 927 F.2d 815, 819 (5th Cir.1991). Such a policy may allow police administrative discretion as to which containers they open, but there must be an actual policy or standardized routine to prevent rummaging for evidence in a particular case. *Id.* The policy need not be written. *Walker,* 931 F.2d at 1068.

██ Officer Crow testified that, if he had arrested Doe on the basis of the juvenile warrants, he would have impounded his vehicle and performed an inventory search on the vehicle, and would have found the incriminating evidence. But, Officer Crow's speculation as to what he would have done in a particular case is not determinative of whether an lawful inventory procedure inevitably would have occurred. In arguing for the admission of evidence seized through a purportedly valid

inventory search, the prosecution must first show that the Rusk City Police Department had an inventory search policy, and that it addressed the opening of closed containers, in particular to comply with *Bertine* & *Wells*. Further, the closed container policy adopted by a department must be one that limits the discretion of the officers in some fashion. *Wells*, 495 U.S. at 3–4, 110 S.Ct. at 1635–36 (quoting *Bertine*, 479 U.S. at 375, 107 S.Ct. at 743). The government must also show a nexus between the policy and the search actually conducted. *Hahn*, 922 F.2d at 247.

■ However, in the context of its inevitable discovery argument, the government is not arguing for the lawfulness of an inventory search that did occur, but, rather, postulating that a proper inventory search inevitably would have occurred. Necessarily, there must be additional proof to show inevitably. Thus, to satisfy the inevitable discovery doctrine, there must be evidence that the standardized inventory procedures were routinely followed by officers in the Rusk City Police Department, and by Officer Crow himself. *United States v. Gorski*, 852 F.2d 692, 696 (2d Cir.1988); *United States v. Hellman*, 556 F.2d 442, 444 (9th Cir.1973); *United States v. Ibarra*, 725 F.Supp. 1195, 1203–04 (D.Wyo.1989), *aff'd on other grounds*, 955 F.2d 1405, 1410 n. 6 (10th Cir.1992).

The case of *United States v. Kordosky*, 909 F.2d 219 (7th Cir.1990) (*Kordosky* II), is instructive. The United States Court of Appeals for the Seventh Circuit found an officer's answers to questions that asked: "What is your standard practice?" could not meet the *Wells* standard, because it was unclear whether the "your" referred to the officer's personal habits or the department's official policy. 909 F.2d at 221. Likewise, the court found testimony that the officer's standard practice was to list "all the items," as nearly as possible, was insufficient to establish that the department had a policy regarding closed containers, which he was following on that occasion. *Id.* Of the two deficiencies, the latter was more important. *United States v. Kordosky*, 921 F.2d 722, 723 (7th Cir.)

(*Kordosky* III) (evidentiary hearing after remand produced evidence that policy regarding closed containers comported with *Wells*), *cert. denied*, —— U.S. ——, 112 S.Ct. 94, 116 L.Ed.2d 66 (1991).

Officer Crow testified on direct examination that his department's policies required officers "to fill out a vehicle inventory impound sheet, list everything that's in the vehicle." On cross-examination Crow testified that the department had no written policy. While a written policy is not necessary, there must be some other evidence from which a court may determine that a policy actually exists. In attempting to describe the sources of the Rusk Police Department's policy, Officer Crow merely stated that when officers are hired, they are given "all the necessary forms, paperwork, such as daily activity logs, your offense reports, vehicle impound sheets." Crow did not testify as to any oral briefings on inventory policy; standard practices followed by other officers; or any other source from which it could be deduced that the department actually has an inventory policy. Most of the remainder of Crow's testimony, on both cross-examination and redirect, regarding inventory searches clearly referred to Crow's personal habits and not to any standardized, routine policy of the Rusk Department of Police.

■ However, on redirect examination, Crow indicated that the "department policies" to which he had made reference in his direct testimony were merely some sort of instructions on the inventory forms given to officers, which admonished them "to list everything" in a searched vehicle. No inventory form from the Rusk Police Department was introduced into evidence at the hearing to demonstrate that the Rusk Police Department's "policy" consisted of something more than a one-line exhortation "to list everything". It cannot be determined solely from Crow's recollection that the sheet's directions required him to "list everything", that the Rusk Police Department has a standardized inventory search procedure that comports with *Bertine* and its progeny.

To constitute a department policy, a set of instructions must be followed routinely by an organization or a unit of the organization. *Kordosky* III, 921 F.2d at 723. Relying only upon the testimony of one officer whose statements in other areas were contradicted, the government has not proved that Rusk police follow a standardized inventory policy. The government has also not given enough information about that policy to allow for a conclusion that the policy would have been inevitably followed in this instance. "An inventory is not an incantation. In the absence of a defined *a priori* policy ... an inventory cannot be objectively distinguished from a search for evidence of a crime." *United States v. Salmon,* 944 F.2d 1106, 1121 (3d Cir.1991) (citation omitted) (finding no standardized policy regarding inventory searches), *cert. denied,* — U.S. —, 112 S.Ct. 1213, 117 L.Ed.2d 451 (1992).

 Moreover, it is found that the government has failed to prove that the Rusk Police Department has reasonable, standardized criteria or routine practices regulating the opening of closed containers found during inventory searches. Officer Crow's single statement that his department's policies, *i.e.,* vehicle impoundment sheet instructions, required him to "list everything in the vehicle", is, by itself, insufficient proof regarding the department's policy on the opening of closed containers. *Kordosky* II, 909 F.2d at 219.[19] The existence of a closed container policy in *Kordosky* was proved on remand by means of testimony from two department officers as to the training of the officers and the "procedures that have been followed throughout the years by the Unit." *Kordosky* III,

921 F.2d at 723. *Cf. Gallo,* 927 F.2d at 819 (district court found that Department's inventory procedure allowed opening of closed cardboard box).[20]

The Fourth Amendment protects items contained in plastic bags. *Smith v. Ohio,* 494 U.S. 541, 542, 110 S.Ct. 1288, 1289, 108 L.Ed.2d 464 (1990) (per curiam). A closed opaque plastic container reasonably manifests an expectation that the contents would remain free from public view. *United States v. Donnes,* 947 F.2d 1430, 1436 (10th Cir.1991). However, when a container is not closed or is transparent, or when its distinctive configuration proclaims its contents, the container supports no reasonable expectation of privacy. *Id.* at 1437. *See also Texas v. Brown,* 460 U.S. 730, 750–51, 103 S.Ct. 1535, 1547–48, 75 L.Ed.2d 502 (1983) (Stevens, J., concurring) (drug balloon may be "one of those rare single-purpose containers which 'by their very nature cannot support a reasonable expectation of privacy because their very contents can be inferred from their outward appearance.'" (citation omitted)).

 It is found that the translucent, white, plastic bag in which the gun and money bag were found was a "closed container" in which defendant possessed a reasonable expectation of privacy. The bag was admitted into evidence and has been examined. It resembles the plastic bags used to carry groceries, and is not transparent but rather translucent. Officer Crow did not testify that he could see the shape of the gun or of any other item contained within the bag through the bag. He did not testify that he thought the bag was of an incriminating nature before he

19. *Cf. United States v. Wilson,* 938 F.2d 785 (7th Cir.1991), *cert. denied,* — U.S. —, 112 S.Ct. 946, 117 L.Ed.2d 115 (1991). There, the Seventh Circuit upheld a *written* state policy which required "An examination and inventory of the contents of all vehicles...." The Seventh Circuit specifically found that the use of the particular word "contents" in a formal policy manual was an implied grant of authority to open all closed containers. 938 F.2d at 789. The use of the word "contents" from *Wilson* distinguished *Wilson* from *Kordosky II,* which had been decided by the same Circuit. The alleged instructions here:

"list everything" are even more vague than "list all items" and it cannot be inferred that it covers closed containers.

20. *United States v. Cooper,* 949 F.2d 737, 748 (5th Cir.1991), *cert. denied,* — U.S. —, 112 S.Ct. 2945, 119 L.Ed.2d 569 (1992), did not involve a closed container inventory search. While the Fifth Circuit found testimony by police officers that department policy required them to "list everything" sufficient to establish an inventory of a vehicle trunk was routine, the court did not address whether such testimony would meet the closed container test of *Wells.*

opened it. *Cf. Horton v. California,* 496 U.S. 128, 141, 110 S.Ct. 2301, 2310, 110 L.Ed.2d 112 (1990) (if incriminating nature of item readily apparent, plain-view seizure doctrine applies). Thus, it is concluded defendant had a reasonable expectation of privacy in the white bag; and, accordingly, the bag is subject to the *Wells* rule regarding the opening of closed containers. It has not been proved that the requirements of *Wells* were satisfied in this case. An order will be issued that shall abate the evidence obtained as a fruit of the car search herein discussed.